[No. A126844. First Dist., Div. Two. May 24, 2011.]

R. THOMAS FAIR, Plaintiff and Appellant, v.
KARL E. BAKHTIARI et al., Defendants and Respondents.

KARL E. BAKHTIARI et al., Plaintiffs, v.
R. THOMAS FAIR, Defendant.

COUNSEL

Nunziato Buckley Weber, Tom A. Nunziato and Illece Buckley Weber for Plaintiff and Appellant and for Defendant.

Eisenberg and Hancock, Jon B. Eisenberg, William N. Hancock; Shartsis Friese, Arthur J. Shartsis and Erick C. Howard for Defendants and Respondents and for Plaintiffs.

OPINION

KLINE, P. J.—

## INTRODUCTION

"The relation between attorney and client is a fiduciary relation of the very highest character, and binds the attorney to most conscientious fidelity—

*uberrima fides.*" (*Cox v. Delmas* (1893) 99 Cal. 104, 123 [33 P. 836]; accord, *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) Accordingly, " '[a]ll dealings between an attorney and his client that are beneficial to the attorney will be closely scrutinized with the utmost strictness for any unfairness.' [Citations.]" (*Ritter v. State Bar* (1985) 40 Cal.3d 595, 602 [221 Cal.Rptr. 134, 709 P.2d 1303] (*Ritter*).) In *Ritter*, the court held that although the terms of the transaction entered into by the attorney and his clients were fair and reasonable, the attorney was subject to discipline for failing to provide his clients with a reasonable opportunity to discuss the transaction with independent counsel, as required by the predecessor to rule 3-300 of the California Rules of Professional Conduct.[1] In so doing, the court rejected the attorney's claim that failure to comply with the rule was a mere " 'technical' " violation. (*Ritter*, at p. 602.) In this case, we consider whether an attorney who entered into very successful business transactions with his clients, but did not provide them the written disclosures required under rule 3-300, was properly denied leave to amend his complaint to state a cause of action for the reasonable value of his services. We shall conclude the trial court did not err in concluding that the attorney's fiduciary breach precluded such recovery.

Plaintiff and cross-defendant R. Thomas Fair (Fair) appeals from a judgment of the San Mateo County Superior Court in favor of respondents Karl E. Bakhtiari, Maryann E. Fair, Stonesfair Management Company, Stonesfair Corporation and Stonesfair Financial Corporation.[2] The court found business agreements between Fair and his client Bakhtiari were properly voided at the election of Bakhtiari and/or the Stonesfair entities, and were unenforceable based on Fair's violation of rule 3-300 and violation of his fiduciary duties under Probate Code section 16004, subdivision (c).[3] It therefore granted judgment in favor of respondents and against Fair. On appeal, Fair does not challenge the court's voiding of the agreements. Rather, he contends the court erred in denying him leave to file a fourth and supplemental complaint to add a cause of action for quantum meruit for the reasonable value of the services he provided to Bakhtiari and the Stonesfair entities. We shall affirm the judgment.

---

[1] Unless otherwise indicated, all "rule" references are to the California Rules of Professional Conduct.

[2] Stonesfair Management Company, Stonesfair Corporation and Stonesfair Financial Corporation are referred to collectively as "the Stonesfair entities." Bakhtiari and the Stonesfair entities are sometimes referred to as "cross-complainants."

[3] Unless otherwise indicated, all statutory references are to the Probate Code.

## FACTS AND PROCEDURAL BACKGROUND

In 1990, Fair was a partner at Hoge, Fenton, Jones & Appel, Inc., and an experienced business attorney, with an expertise in the formation and structure of syndications. He was also a licensed real estate broker. Bakhtiari had inherited a substantial sum of money and had begun looking for real estate investment opportunities. Bakhtiari first met with Fair in December 1989 or January 1990, when Bakhtiari sought and obtained legal advice concerning his potential investments in one such opportunity (Chartwell). At their meeting, Fair took possession of the Chartwell contracts and told Bakhtiari that he would review them and look out for Bakhtiari's best interests. An attorney-client relationship was formed at this meeting and continued until December 2000.

In April 1990, Fair and Bakhtiari went into business together, forming Stonesfair Corporation. Fair approached Bakhtiari with the proposal that they form a real estate investment business. The two orally agreed to divide ownership of Stonesfair Corporation, 70 percent to Bakhtiari and 30 percent to Fair, with the former serving as president and the latter as vice-president. According to Bakhtiari, this arrangement reflected each partner's contribution: "[Fair] brought his legal expertise, and I brought the money." The trial court found that, despite Bakhtiari being a highly intelligent man, the depth of Fair's professional training created a "substantial inequality in the two men's backgrounds and level of experience and expertise when they went into business together."

Bakhtiari and Fair formed two additional partnerships together: Stonesfair Financial Corporation in 1993 and Stonesfair Management Company, LLC, in 1996, in which Fair acquired minority ownership shares of 27.5 percent and 5 percent, respectively.[4] These business relationships lasted until mid-2001. Fair represented each business from its inception and performed similar services for each of the Stonesfair entities. Fair claimed to have provided business and real-estate-related services, including analyzing and identifying markets, finding acquisition targets, forming relationships, soliciting investors and negotiating deals with owners and lenders. He provided all legal services for these entities between 1990 and 2000. He rendered legal opinion letters, provided legal advice relating to their real estate transactions, documents and contracts, and drafted all of the Stonesfair entities' partnership, real estate purchase, subscription, and loan agreements. He also conducted all loan agreement negotiations for the Stonesfair entities. Fair provided the Stonesfair entities with legal services such as these in at least 15 different real estate

---

[4] Fair's interest in Stonesfair Financial Corporation was later halved by his divorce settlement with his former wife, respondent Maryann Fair.

transactions.[5] The trial court found that an attorney-client relationship existed between Fair and each of the Stonesfair entities, as well as with Bakhtiari, that did not terminate until December 2000. For his services, Fair received "substantial compensation and profit distributions." Fair claimed that, despite holding only a minority stake in each Stonesfair entity, he and Bakhtiari had orally agreed to split back-end profits and other revenue generated by these entities 50/50. The trial court found the parties had not reached any such agreement.

In late 1993, Fair began receiving a salary from Stonesfair Corporation. Maryann Fair became an employee of Stonesfair Financial Corporation in November 1993. Fair left the law firm in August 1994. Fair was employed by, worked full time for, and received a salary from Stonesfair Financial Corporation. Additionally, he negotiated for, claimed entitlement to, and/or received other monetary benefits from all three of the Stonesfair entities based on his specific contributions to their respective businesses. Stonesfair Financial Corporation paid his bar dues and continuing legal education course fees so that he could retain good standing with the State Bar.[6]

Fair and Bakhtiari entered into the business agreements without first agreeing on many essential terms, including their respective rights to compensation, shareholder rights, division of profits, and other monetary benefits to be derived from their joint efforts. Fair and Bakhtiari discussed, debated, and disagreed about the most basic terms of their business transactions throughout the course of their relationship. Fair never gave advice against himself to Bakhtiari. The failure to reach agreement on essential terms of the relationship was a constant source of debate and disagreement throughout the course of their business relationship and contributed to its demise. Fair ceased receiving compensation as a Stonesfair Financial Corporation employee in June 2001.

Because Fair was representing Bakhtiari and the Stonesfair entities when he entered into the various business transactions with them, he was required to comply with rule 3-300. At all relevant times the rule provided:

---

[5] Fair claimed in briefing below that he identified hidden "real estate 'gems' " for acquisition, solicited investors that provided the Stonesfair entities with operating capital, and created valuable relationships with lenders. The trial court made no such findings and Fair has pointed to no evidence in the record tending to corroborate these claims. However, the focus of trial was upon Fair's legal services, not other services, as he at various times denied having an attorney-client relationship with Bakhtiari or the Stonesfair entities.

[6] The record does not indicate the amount of Fair's compensation before 1998. Fair's annual compensation in 1998 was $670,000. In 1999, it dropped to between $305,000 and $310,000. Fair received compensation of $650,000 in 2000.

### "Rule 3-300. Avoiding Interests Adverse to a Client

"A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:

"(A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and

"(B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and

"(C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition."

Fair was aware of the requirements of rule 3-300 before he went into business with Bakhtiari, but Fair did not comply with the rule upon entering into business with Bakhtiari, not later, with the Stonesfair entities, and not at any time thereafter. The court found Fair knowingly acquired interests adverse to Bakhtiari and/or each of the Stonesfair entities, his clients. In doing so, Fair failed to disclose in writing the terms of the business transactions being entered into with his clients. He did not advise them in writing of their right to seek independent legal advice. Nor did he obtain his clients' written consent to the terms of the transactions. In his dealings with Bakhtiari and the Stonesfair entities, Fair did not carefully separate out his client relationships, but instead represented individuals and entities that had potential conflicts of interest in business transactions.[7] The trial court found, and Fair does not dispute, that Fair violated rule 3-300.

*This litigation*

On May 30, 2001, Fair filed a complaint against Bakhtiari for personal injuries and alleged causes of action for assault and battery (Super. Ct. San Mateo County, 2001, No. CIV417058). Fair amended his complaint to name the remaining defendants and to add additional claims. His third amended

---

[7] For example, the court found that in a rule 3-310 letter Fair wrote to Thomas P. Mullaney at Chartwell Holdings, Fair referenced Fair's *simultaneous representation* of Chartwell Holdings, Chartwell PFE Riolo Investors, L.P., and KEB Associates (a general partnership involving Bakhtiari) and acknowledging these entities had potential conflicts with each other. The court found that Fair "never informed Bakhtiari of his representation of Chartwell when he later represented Bakhtiari in connection with problems and concerns Bakhtiari had with his Chartwell investments."

complaint alleged 13 causes of action, and sought compensatory and punitive damages, injunctive relief, restitution and disgorgement of profits, dissolution, attorney fees and costs.[8]

On October 15, 2003, while a pending appeal stayed proceedings in that case, Bakhtiari and the Stonesfair entities filed a complaint against Fair (Super. Ct. San Mateo County, 2003, No. CIV434863). In a first amended complaint they alleged causes of action for (1) declaratory relief; (2) rescission; (3) imposition of constructive trust; (4) legal malpractice; (5) breach of fiduciary duty; (6) indemnity; and (7) accounting. Among other things, they sought a declaration that Fair's interests in the Stonesfair entities were void as against public policy. On August 10, 2007, the two actions were consolidated.

On July 17, 2008, after the stay pending appeal had been lifted, Bakhtiari and the Stonesfair entities filed their second amended cross-complaint against Fair in case No. CIV417058, alleging the same seven causes of action previously alleged in their complaint, expanding the cause of action for breach of fiduciary duty, and adding three new causes of action. The prayer sought a declaration that Fair's interests in the Stonesfair entities were void; restitution and disgorgement of profits; imposition of a constructive trust; an accounting; compensatory, statutory and punitive damages; indemnity; injunctive relief; attorney fees and costs.

On July 22, 2008, the date for which trial had been set, Fair moved for leave to amend his complaint to add causes of action for quantum meruit and an accounting. On July 24, 2008, the court granted Fair's motion as to the accounting claim and deferred ruling on the quantum meruit claim until the court's concerns were answered regarding whether quantum meruit would be legally available if the court ultimately determined the subject agreements were void and unenforceable based on a violation of rule 3-300 and, if so, whether cross-complainants would be prejudiced by the need for expert opinion to establish the reasonable value of Fair's services under such

---

[8] Fair's third amended complaint alleged causes of action for (1) breach of contract against Bakhtiari, Stonesfair Corporation and Stonesfair Financial Corporation; (2) breach of fiduciary duty against Bakhtiari and Maryann Fair (Fair's ex-wife); (3) corporate waste against Bakhtiari and Maryann Fair; (4) assault against Bakhtiari; (5) battery against Bakhtiari; (6) wrongful and retaliatory termination in violation of public policy against Bakhtiari and Stonesfair Financial Corporation; (7) wrongful termination against Bakhtiari and Stonesfair Financial Corporation; (8) intentional infliction of emotional distress against Bakhtiari and Maryann Fair; (9) unfair business practices against Bakhtiari, Maryann Fair and Stonesfair Management Company; (10) interference with economic relations against all respondents; (11) conversion against Bakhtiari, Maryann Fair and Stonesfair Management Company; (12) fraud against Bakhtiari, Maryann Fair, and Stonesfair Financial Corporation; and (13) constructive fraud against Bakhtiari and Maryann Fair.

quantum meruit claim. Fair dropped his prayer for dissolution and Bakhtiari and the Stonesfair entities withdrew their legal malpractice claim.

On July 24, 2008, the court also bifurcated the claims, conducting a bench trial first on equitable claims alleged in Bakhtiari and the Stonesfair entities' second amended cross-complaint for declaratory relief, rescission, imposition of constructive trust, accounting and breach of fiduciary duty, and including Fair's defenses to those equitable claims based on the statute of limitations, laches and ratification.

The bench trial began on July 31, and ended on August 20, 2008. During closing arguments, counsel for respondents clarified that Bakhtiari and the Stonesfair entities were seeking to prevent enforcement of the various agreements Fair contended existed, but they were no longer seeking any return of monies that Fair had already obtained during the business transactions, nor any accounting thereof. Following the trial, the Honorable Carol L. Mittlesteadt found in a comprehensive and thoughtful statement of decision that Fair had violated rule 3-300, raising a presumption of undue influence under section 16004, subdivision (c). The court found that Fair had failed to rebut that presumption. Although Fair had established that "each of the subject business transactions was fair and reasonable," and that Stonesfair Financial Corporation's business was "tremendously successful," the material terms and conditions of these business transactions were not fully explained to and understood by Bakhtiari at the time. Consequently, the court found the presumption of undue influence under section 16004 was not rebutted. The court granted cross-complainants' request for declaratory relief and rescission under the first and second causes of action of their first amended complaint and second amended cross-complaint, and declared the business agreements between Fair and cross-complainants to be void and unenforceable.

Thereafter, the parties briefed the quantum meruit issue. At a hearing on December 19, 2008, the court denied Fair's motion for leave to amend to add a quantum meruit claim. The court filed its 29-page statement of decision on January 6, 2009. The statement of decision did not address the quantum meruit issue, other than noting that the court had deferred ruling on the claim "until certain concerns expressed by the court could be more fully addressed."

On August 10, 2009, the court entered judgment in favor of cross-complainants Bakhtiari and the Stonesfair entities on the first and second causes of action for declaratory relief and rescission of their first amended complaint and second amended cross-complaint. Cross-complainants had waived other affirmative claims for relief. Based upon the court's ruling on cross-complainants' declaratory relief and rescission causes of action, the

court entered judgment in favor of respondents on the remaining causes of action of Fair's third amended complaint. The judgment related that the parties had entered into a settlement agreement under which Fair would dismiss his fourth, fifth and eighth causes of action for assault, battery, and intentional infliction of emotional distress. This timely appeal followed.[9]

## DISCUSSION

### I. Standard of Review

" 'An application to amend a pleading is addressed to the trial judge's sound discretion. [Citation.] On appeal the trial court's ruling will be upheld unless a manifest or gross abuse of discretion is shown. [Citations.] The burden is on the [appellant] to demonstrate that the trial court abused its discretion.' [Citation.]

■ "Code of Civil Procedure section 473, which gives the courts power to permit amendments in furtherance of justice, has received a very liberal interpretation by the courts of this state. (*Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 19 [108 P.2d 906]; *Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 760 [135 Cal.Rptr.2d 433].) In spite of this policy of liberality, a court may deny a good amendment in proper form where there is unwarranted delay in presenting it. (*Record v. Reason* (1999) 73 Cal.App.4th 472, 486 [86 Cal.Rptr.2d 547]; accord, *Yee v. Mobilehome Park Rental Review Bd.* (1998) 62 Cal.App.4th 1409, 1428–1429 [73 Cal.Rptr.2d 227]; *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 475, 486–487 [55 Cal.Rptr.2d 225].) On the other hand, where there is no prejudice to the adverse party, it may be an abuse of discretion to deny leave to amend. (*Atkinson v. Elk Corp., supra*, 109 Cal.App.4th at p. 761.)" (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 544–545 [66 Cal.Rptr.3d 175]; see also Code Civ. Proc., § 426.50 [amendment of compulsory cross-complaint].[10])

As a threshold matter, respondents contend that in the absence of a statement of decision explaining the court's reasons for the denial of the

---

[9] A formal order denying Fair's motion for leave to amend was filed on May 18, 2010.

[10] Code of Civil Procedure section 426.50, relating to compulsory cross-complaints, provides: "A party who fails to plead a cause of action subject to the requirements of this article, whether through oversight, inadvertence, mistake, neglect, or other cause, may apply to the court for leave to amend his pleading, or to file a cross-complaint, to assert such cause at any time during the course of the action. The court, after notice to the adverse party, shall grant, upon such terms as may be just to the parties, leave to amend the pleading, or to file the cross-complaint, to assert such cause if the party who failed to plead the cause acted in good faith. This subdivision shall be liberally construed to avoid forfeiture of causes of action."

motion we must imply a finding that the denial of Fair's motion to amend was based on inexcusable delay or prejudice to respondents. Respondents' attempt to invoke the "doctrine of implied findings" applicable in circumstances where the parties have waived a statement of decision (see Code Civ. Proc., § 632) either by failing to request it or by an untimely request, misses the mark.[11]

■ Code of Civil Procedure section 632 statements of decision apply upon the *trial* of a question of fact by the court. (And the court here did issue a lengthy statement of decision following trial of the equitable issues.) The statement of decision requirement does not apply to the denial of a *motion*, such as the denial of Fair's motion to amend his complaint at issue here. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:24.5, pp. 8-13 to 8-14 (rev. # 1, 2010); *Lavine v. Hospital of the Good Samaritan* (1985) 169 Cal.App.3d 1019, 1026 [215 Cal.Rptr. 708] [a statement of decision "is neither required nor available upon decision of a motion"].) The general rule is that a trial court need not issue a statement of decision after a ruling on a motion. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294 [240 Cal.Rptr. 872, 743 P.2d 932].) As Eisenberg observes, "no known reported decision has invoked the doctrine of implied findings on appeal of a motion ruling because of the parties' failure to request a statement of decision at the motion hearing. . . ." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:24.6, p. 8-14 (rev. # 1, 2010).)

"The absence of a statement of decision [in connection with the court's denial of a motion] *does not* affect the standard of review. We presume that the court's order is supported by the record; if there is substantial evidence in the record to support the court's *implied finding of fact*, the factual finding will be upheld. However, the conclusion the court reached based upon those findings of fact will be reviewed by this court for abuse of discretion." (*Higdon v. Superior Court* (1991) 227 Cal.App.3d 1667, 1671 [278 Cal.Rptr. 588], italics added; see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:24.5, pp. 8-13 to 8-14.) Consequently, although the doctrine of implied findings related to statements of decision does not apply to the court's denial of the motion here, the usual standard of review—that we will imply findings in favor of the court's denial of the motion—does. As a general rule, "even where there are no express findings, we must review the

---

[11] Where a statement of decision is waived, "the appellate court will presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record; i.e., the necessary findings of 'ultimate facts' will be implied and the only issue on appeal is whether the 'implied' findings are supported by 'substantial evidence.' [Citations.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 8:22, p. 8-8 (rev. # 1, 2009); see *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267 [88 Cal.Rptr.3d 186] [absent a statement of decision, the trial court is presumed to have made all findings necessary to support the judgment].)

trial court's exercise of discretion based on implied findings that are supported by substantial evidence." (*Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co.* (1998) 68 Cal.App.4th 856, 860 [80 Cal.Rptr.2d 634] [affirming trial court's denial of attorney disqualification motion].) That rule flows logically from the fundamental precept of appellate practice that we review the court's ruling, not its rationale. (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1143 [97 Cal.Rptr.2d 707] [summary judgment]; *Sackett v. Wyatt* (1973) 32 Cal.App.3d 592, 598, fn. 2 [108 Cal.Rptr. 219] [demurrer].) In *Sidney v. Superior Court* (1988) 198 Cal.App.3d 710, 718 [244 Cal.Rptr. 31], the court acknowledged the general rule, but found it inapplicable where "the trial court made clear in its written ruling . . . that its order . . . was *exclusively* based on its erroneous holding that the statute of limitations" had run. (*Ibid.*, italics added.)

Although the court here made no express findings in its written order denying the motion, it is clear that the court did not deny the motion on the ground that Fair acted in bad faith or unreasonably delayed seeking to amend to assert the quantum meruit cause of action. At the July 24, 2008 hearing, the court stated it was "not so concerned about the timing of this," given its understanding that the amendment was a reaction to the court's having the week before allowed cross-complainants to file a second amended cross-complaint that weakened Fair's statute of limitations defense. However, the court did express its concern that the amendment would prejudice cross-complainants because of the need for expert witnesses on the issue of the reasonable value of Fair's services and the failure of either Fair or cross-complainants to designate such an expert. At one point in that hearing the court stated, "[p]rejudice will be the reason I deny that motion, if I do deny it." At the outset of the hearing of December 19, 2008, at which the court denied the motion to amend, it set forth a "tentative ruling" that it adopted following argument by the parties. That tentative ruling did not identify either delay in bringing the motion or prejudice to cross-complainants as the reason for denial. Rather, the court concluded that, based upon its findings relating to Fair's violations of rule 3-300, his breaches of his fiduciary duties to these clients, and the inability to separate services provided by Fair from the unenforceable business transactions, quantum meruit was not available.

Therefore we will not infer that the denial was based upon either unreasonable delay or prejudice to cross-complainants. Were that the case, given the court's bifurcation of equitable and legal issues and trial of the equitable issues first, it appears that any prejudice to cross-complainants from the need to secure expert testimony or additional discovery relating to the quantum meruit claim could have been remedied by providing such limited further discovery on that legal issue between the date Fair moved to amend (July 24, 2008) and the date the court decided the motion four months later.

## II. Denial of Quantum Meruit

■ "Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.' [Citation.] To recover in quantum meruit, a party need not prove the existence of a contract [citations], but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made' [citations]." (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458 [9 Cal.Rptr.3d 693, 84 P.3d 379] (*Huskinson*); accord, *Olsen v. Harbison* (2010) 191 Cal.App.4th 325, 330 [119 Cal.Rptr.3d 460]; *Strong v. Beydoun* (2008) 166 Cal.App.4th 1398, 1404 [83 Cal.Rptr.3d 632].)

■ "Where the entire contract is prohibited by statute or public policy, recovery in quantum meruit based on the reasonable value of services performed *may* or *may not* be allowed. [Citations.]" (Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2010) ¶ 5:430, p. 5-68.11 (rev. # 1, 2010) (Vapnek, Professional Responsibility).)

■ "California courts have often held that when *the ethical violation in question is a conflict of interest between the attorney and the client (or between the attorney and a former client), the appropriate fee for the attorney is zero. At least that is true when the violation is one that pervades the whole relationship. See, e.g., Clark v. Millsap*, 197 Cal. 765, 785 [242 P. 918] (1926) (relationship permeated with fraud after gaining control of client's assets; no attorneys' fee proper); *Day v. Rosenthal*, 170 Cal.App.3d 1125, 1162 [217 Cal.Rptr. 89] (1985) (no finding on reasonable value of attorneys' services necessary because conflict of interest rendered services valueless), *cert. denied*, 475 U.S. 1048 [89 L.Ed.2d 576, 106 S.Ct. 1267] (1986); *Jeffry v. Pounds*, 67 Cal.App.3d 6, 12 [136 Cal.Rptr. 373] (1977) (law firm entitled to compensation only for services it rendered prior to its breach of professional conduct by accepting representation of client's wife in marital dispute without the client's consent); *Goldstein v. Lees*, 46 Cal.App.3d 614, 617–[618] [120 Cal.Rptr. 253] (1975) (attorney who undertook to represent a client in a proxy fight with a corporation for which the attorney had been general counsel could not recover any fees); *Conservatorship of Chilton*, 8 Cal.App.3d 34, 43 [86 Cal.Rptr. 860] (1970) (in case of a clear conflict of interest, there was no error when the trial court found no value in the services rendered); *see also Asbestos Claims Facility v. Berry & Berry*, 219 Cal.App.3d 9, 26–27 [267 Cal.Rptr. 896] (1990)[12] (one of the methods by which the issue of attorney's conflict of interest may be raised is as a defense in the

---

[12] Disapproved on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888, 896–899 [12 Cal.Rptr.2d 728, 838 P.2d 250].

attorney's action to recover fees)." (*U.S. v. Jerry M. Lewis Truck Parts & Equipment* (9th Cir. 1996) 89 F.3d 574, 579–580, italics added; see Vapnek, Professional Responsibility, *supra*, ¶ 5:1026, p. 5-123 (rev. # 1, 2010).)

## A. *Violation of Probate Code Section 16004*

Fair does not challenge the court's voiding of his agreements with Bakhtiari. Rather, he purports to challenge only the denial of leave to amend his complaint to allow him to seek quantum meruit and the court's application of section 16004. Fair devotes a significant portion of his argument to his assertion that the trial court erred in finding he breached his fiduciary duty to Bakhtiari under section 16004, contending that he rebutted the presumption of undue influence under that code section. Fair never clearly articulates *why* his challenge to the court's finding a breach of fiduciary duty under section 16004 matters. The court relied upon both the violation of rule 3-300 *and* its finding that Fair breached his fiduciary duty under section 16004, in voiding the agreements. In failing to challenge the court's finding that he violated rule 3-300 and its voiding of the agreements, Fair appears to suggest on appeal, contrary to his claim in the trial court, that his violation of the rule was sufficient by itself to render the business agreements voidable at the option of cross-complainants.[13] Consequently, Fair's challenge to the court's finding that he breached his fiduciary duty under section 16004 appears intended to support his argument that his breach of the rule was a technical violation of a Rule of Professional Conduct of the type that courts have determined allows a quantum meruit recovery, rather than a more serious violation of an express statutory prohibition or "violations of a rule that proscribed the very conduct for which compensation was sought," such as rules prohibiting attorneys from engaging in conflicting representation or accepting professional employment adverse to the interests of a client. (*Huskinson, supra*, 32 Cal.4th at p. 463.)

The court's finding that Fair did not rebut the presumption that arose under section 16004 supports its determination that Fair's violation of rule 3-300 constituted not merely a technical rule violation, but the breach of Fair's fiduciary duty to Bakhtiari and the Stonesfair entities, and that the conflict of interest that occurred as a result of Fair's violations of the rule precluded quantum meruit recovery by Fair.

We therefore address whether the court erred in finding that Fair did not rebut the presumption of section 16004 that he breached his fiduciary duty to Bakhtiari. We shall conclude the court did not err.

Section 16004, addressing conflicts of interest, provides in relevant part:

---

[13] At trial, Fair's counsel argued to the contrary, that cross-complainants could not void their agreements with him unless the agreements fell within the scope of section 16004, subdivision (c).

"(a) The trustee has a duty not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust, nor to take part in any transaction in which the trustee has an interest adverse to the beneficiary. [¶] . . . [¶]

"(c) A transaction between the trustee and a beneficiary which occurs during the existence of the trust or while the trustee's influence with the beneficiary remains and by which the trustee obtains an advantage from the beneficiary is presumed to be a violation of the trustee's fiduciary duties. This presumption is a presumption affecting the burden of proof. This subdivision does not apply to the provisions of an agreement between a trustee and a beneficiary relating to the hiring or compensation of the trustee." (See generally *BGJ Associates v. Wilson* (2003) 113 Cal.App.4th 1217, 1227–1229 [7 Cal.Rptr.3d 140] (*BGJ Associates*); *Ramirez v. Sturdevant* (1994) 21 Cal.App.4th 904, 917 [26 Cal.Rptr.2d 554].)

■ "[S]ection 16004 is a statutory complement to rule 3-300." (*BGJ Associates, supra,* 113 Cal.App.4th at p. 1227.) Like its predecessor, Civil Code former section 2235, Probate Code section 16004 applies to the attorney-client relationship. (*Ramirez v. Sturdevant, supra,* 21 Cal.App.4th at p. 917.) "A violation of the Rules of Professional Conduct subjects an attorney to disciplinary proceedings, but does not in itself provide a basis for civil liability. [Citation.] But the rules, 'together with statutes and general principles relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which the attorney owes to his or her client.' [Citation.]" (*BGJ Associates,* at p. 1227; see *Mirabito v. Liccardo* (1992) 4 Cal.App.4th 41, 45–46 [5 Cal.Rptr.2d 571] [predecessor of rule 3-300 properly used to set standard by which the attorney's fiduciary duty is measured].)

■ In *BGJ Associates, supra,* 113 Cal.App.4th 1217, 1227–1228, the appellate court explained the operation of section 16004: "Probate Code section 16004 applies to the fiduciary relationship between attorney and client. [Citation.] Accordingly, '[a] transaction between an attorney and client which occurs during the relationship and which is advantageous to the attorney is presumed to violate that fiduciary duty and to have been entered into without sufficient consideration and under undue influence.' [Citation.] As explained long ago in *Felton v. Le Breton* (1891) 92 Cal. 457, 469 [28 P. 490]: 'While an attorney is not prohibited from having business transactions with his client, yet, inasmuch as the relation of attorney and client is one wherein the attorney is apt to have very great influence over the client, especially in transactions which are a part of or intimately connected with the very business in reference to which the relation exists, such transactions are always scrutinized by courts with jealous care, and are set aside at the mere

instance of the client, unless the attorney can show by extrinsic evidence that his client acted with full knowledge of all the facts connected with such transaction, and fully understood their effect; and in any attempt by the attorney to enforce an agreement on the part of the client growing out of such transaction, the burden of proof is always upon the attorney to show that the dealing was fair and just, and that the client was fully advised.' [Citation.]"

Fair does not challenge the finding that his violation of rule 3-300 triggered the section 16004 presumption. Rather, he contends that he rebutted the presumption. In support of his contention, he relies upon the court's finding that "each of the subject business transactions was fair and reasonable," and its finding that Stonesfair Financial Corporation's business was "tremendously successful." This latter finding, Fair interprets to mean that cross-complainants sustained no damages. Fair argues that "without damages there can be no breach of fiduciary duty."

■ 1. *Damage*. Fair argues there was no damage to Bakhtiari from Fair's ethical violation, as the parties' real estate investments were very successful.[14] Fair conflates the tort cause of action for breach of fiduciary duty, which requires damages as an element (*Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1509 [85 Cal.Rptr.3d 268] (*Shopoff*)), with the breach of a fiduciary duty to a client under section 16004, sufficient to warrant voiding of an agreement. Breach and damages are two distinct elements of the tort cause of action. An attorney may violate the statute and breach his or her fiduciary duties to the client without causing the client damages. It makes sense to require proof of damages where the client seeks compensatory damages as a tort remedy for breach of fiduciary duty, but not if the client seeks only forfeiture of fees. The purpose of compensatory damages is to make plaintiffs whole for harm caused by defendants. (See Rest.2d Torts, § 903, com. a, pp. 453–454.) Forfeiture of legal fees serves several different purposes. It deters attorney misconduct and recognizes that damage caused by attorney misconduct is often difficult to assess. (Rest.3d The Law Governing Lawyers, § 37, com. b, p. 272.) It prevents fiduciaries from profiting from their fiduciary breach and disloyalty. (See, e.g., *Woods v. City Bank Co.* (1941) 312 U.S. 262, 268–269 [85 L.Ed. 820, 61 S.Ct. 493]; Rest.2d Agency, § 469, com. a, p. 400.) Like compensatory damages, it compensates clients for harm they have suffered, but it reflects not the harms the clients suffer from the tainted representation, but the decreased value of the representation itself. (See Vapnek, Professional Responsibility, *supra*, ¶ 5:1026, p. 5-123.)

No authority cited by Fair holds that proof the client was damaged by the attorney's breach of fiduciary duty or conflict of interest is required to void

---

[14] We note that not *all* investments were successful, as Bakhtiari's Chartwell Holdings investment performed poorly and ultimately failed.

the agreement between the two or to deny the attorney quantum meruit recovery of fees where the breach is sufficiently serious. Ultimately, Bakhtiari did not seek tort damages or disgorgement of fees or sums paid to Fair and the court did not here award damages. Rather, it voided the tainted agreements and refused to allow Fair to amend his complaint to seek the reasonable value of his services.

Moreover, were damages required, the damage to Bakhtiari was not from the individual investments themselves (which the court found to be fair and reasonable), but from the disproportionate back-end interests and profits from those investments to which Fair claimed entitlement. As the trial court noted in its statement of decision, Fair claimed to be entitled to 50 percent of all back-end profits, whether or not his ownership interests in the Stonesfair entities were voided. This claim was damaging to Bakhtiari as it was vastly disproportionate to Fair's ownership interests in the Stonesfair entities. As respondents maintain, independent counsel surely would have advised Bakhtiari that profits should have been distributed in accordance with the parties' ownership interests.

██ 2. *Advantage*. Fair reasons he did not obtain an "advantage" from Bakhtiari within the meaning of section 16004. He further argues that even if the agreements "would have given [him] an advantage they were declared void and for that reason did not exist as a matter of law and could not give [him] an advantage with respect to Bakhtiari or the Stonesfair Entities." This reasoning is specious. Rule 3-300 and section 16004 make the underlying agreements "voidable, not void" at the election of the client. (*BGJ Associates, supra*, 113 Cal.App.4th at p. 1229.) The agreements existed before they were voided at cross-complainants' election, and they conferred significant financial advantages to Fair.

██ Substantial evidence supports the trial court's finding that Fair obtained an advantage within the meaning of section 16004. Both Fair's acquisition of ownership interests in the Stonesfair entities and the back-end compensation to which he claimed to be entitled on the various projects undertaken by the Stonesfair entities were advantages within the meaning of the statute. As observed by the California Supreme Court in *Bradner v. Vasquez* (1954) 43 Cal.2d 147 [272 P.2d 11], in rejecting the plaintiff's contention that the advantage gained by the fiduciary must be an *unfair* advantage before the statutory presumptions are raised, "[w]hen a fiduciary enters into a transaction with a beneficiary whereby the fiduciary's position is improved, or he obtains a favorable opportunity, or where he otherwise gains, benefits, or profits, it may fairly be said that an advantage has been obtained." (*Id.* at p. 152; accord, *Rader v. Thrasher* (1962) 57 Cal.2d 244 [18 Cal.Rptr. 736, 368 P.2d 360].) In entering into the business agreements with Bakhtiari,

Fair's financial position was improved, he obtained favorable opportunities and he gained, benefitted and profited substantially.

3. *Undue influence and breach of fiduciary duties.* In *BGJ Associates, supra,* 113 Cal.App.4th 1217, the evidence supported the findings of the trial court that the presumption of undue influence arising under section 16004 was not rebutted. There, not only did substantial evidence support the trial court's finding that the agreement was not fair and reasonable as to the client, but at least as important, "there was no evidence that [the attorney] informed his client of the perils of entering into" the venture. (113 Cal.App.4th at p. 1229.) "Where an attorney enters into a business arrangement with a client, ' "he must make it manifest that he gave to his client 'all that reasonable advice against himself that he would have given him against a third person.' [Citations.]" ' [Citation.]" (*Ibid.*) Because the attorney in *BGJ Associates* could not make this showing, he was unable to refute the presumption that the agreement was the result of undue influence by which the attorney would obtain an advantage over the client. Therefore, the trial court properly concluded that the agreement was the product of undue influence in violation of the attorney's fiduciary duties within the meaning of section 16004, rendering the agreement voidable. (113 Cal.App.4th at p. 1229.)

Here, the court could well determine that Fair failed to rebut the presumption of undue influence and breach of his fiduciary duties arising under section 16004. In entering into the various business transactions with his clients, Fair "was required to satisfy all three requirements of rule 3-300." (*BGJ Associates, supra,* 113 Cal.App.4th at p. 1226.) To rebut the presumption of undue influence under section 16004, the attorney must " 'show that the dealing was fair and just, *and* that the client was fully advised.' " (*BGJ Associates,* at pp. 1227–1228, italics added.) As the court found, although Fair established that "each of the subject business transactions was fair and reasonable," and that Stonesfair Financial Corporation's business was "tremendously successful," the material terms and conditions of these business transactions were not fully explained to and understood by Bakhtiari at the time. "[T]he evidence . . . overwhelmingly demonstrates that there were so many material terms on which there was no agreement at all." Moreover, during the ongoing process of wrangling about many of the essential terms, "Fair never gave advice against himself to Mr. Bakhtiari." Substantial evidence supports the court's finding that the inability of Fair and Bakhtiari to reach agreement on material terms of the relationship was the result, at least in part, of Fair's undue influence over Bakhtiari and the failure of Fair to comply with the requirements of rule 3-300.[15] As stated by our Supreme

---

[15] Specifically, the court found: "In order for these business transactions to pass muster under Rule 3-300 and Section 16004(c), it was incumbent upon Mr. Fair to clearly explain, discuss, and obtain Mr. Bakhtiari's consent to these most basic terms in advance. Instead, this

Court, "[t]he fact that defendants never had any independent advice is also a circumstance of undue influence. [Citations.] Thus the record presents the familiar picture of conflicting evidence upon the disputed issues which were to be determined. The trial court found that there was undue influence, and since this finding is supported by the evidence, it will not be disturbed on appeal." (*Bradner v. Vasquez, supra*, 43 Cal.2d at pp. 153–154.) We agree.

The court did not err in finding that Fair did not rebut the presumption under section 16004, and that Fair breached his fiduciary duty to Bakhtiari and the Stonesfair entities by his failure to comply with rule 3-300 before entering into business with them and during the course of their business relationship. The question, then, is whether the trial court could properly determine that this breach of fiduciary duty due to its nature or seriousness was such as to warrant the denial of quantum meruit recovery.

## B. *No Severance*

Fair argues the services he provided can be severed from the voided agreements. He focuses on the specific services he rendered, arguing they were lawful and not in conflict with public policy so that the value of those services is the proper subject of a quantum meruit claim. He asserts he is not seeking to recover the ownership interests in the businesses he would have had had the agreements not been voided, or to recover for those specific services giving rise to the void agreements. Rather, he seeks quantum meruit for services of a type regularly and legally performed by business people, real estate brokers and lawyers that violate no public policy. In the trial court, Fair described the services for which he would seek compensation as business- and real-estate-related services, legal services, analyzing and identifying markets, finding acquisition targets, forming relationships, negotiating deals with owners and lenders, and soliciting investors. Fair made it clear that he would seek to prove the value of his services, not by presenting expert testimony, but by testimony of the parties and evidence of the value the parties put on the services. Not only would he "testify about the nature and extent of the services he performed," but he maintained that "the parties' own contemporaneous evaluations of the value of these services—although not enforceable contractually—[would] certainly shed light on the value." Thus, as evidence of the reasonable value of the services, Fair would seek to introduce the history of negotiations between the parties and the void agreements themselves as reflecting "[t]he formulas that Fair and Bakhtiari adopted to measure the value of their services (e.g., the back-end split criteria) . . . ." In the trial court, Fair acknowledged that in light of the court's

---

failure to reach agreement was a constant source of debate and disagreement throughout the course of their business relationship and contributed to its demise. Under these circumstances, Mr. Fair has failed to rebut the presumption of undue influence."

finding of a conflict of interest, he would not properly be compensated for the reasonable value of setting up the Stonesfair entities. Nevertheless, he sought compensation for the myriad of services he provided the companies thereafter, contending that there was no conflict of interest in his rendering of those services and that he should be compensated for services rendered *after* his violation of the rule.

■ Fair's reliance on the doctrine of severance is misplaced. Civil Code section 1599 codifies the common law doctrine of severability of contracts. (*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 991 [70 Cal.Rptr.3d 727, 174 P.3d 741] (*Marathon*).) It provides: "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." (Civ. Code, § 1599.) "If a contract is capable of severance, the decision whether to sever the illegal portions and enforce the remainder is a discretionary decision for the trial court to make based on equitable considerations. (*Marathon, supra*, 42 Cal.4th at pp. 992, 996, 998.)" (*MKB Management, Inc. v. Melikian* (2010) 184 Cal.App.4th 796, 803 [108 Cal.Rptr.3d 899] (*MKB Management*).) The purpose of severing or restricting illegal terms rather than voiding the entire agreement is twofold: " 'to prevent parties from gaining undeserved benefit or suffering undeserved detriment . . . particularly when there has been full or partial performance of the contract [and,] more generally, . . . to conserve a contractual relationship if to do so would not be condoning an illegal scheme. [Citations.] . . . [Citation.]' " (*Id.* at pp. 803–804.)

As the Supreme Court explained in *Marathon, supra*, 42 Cal.4th at page 993, a wide range of cases have applied the doctrine of severance to *partially enforce contracts* involving unlicensed services. In *Marathon*, the plaintiff personal manager had acted as a talent agency without the license required under the Talent Agencies Act (Lab. Code, § 1700 et seq.). (*Marathon*, at p. 990.) The act provided that such conduct was illegal. *Marathon* found nothing in the act repudiating the generally applicable rule of severability. Therefore, it concluded that severability was available, but not mandatory. The court recognized that "no verbal formulation can precisely capture the full contours of the range of cases in which severability properly should be applied, or rejected. The doctrine is equitable and fact specific, and its application is appropriately directed to the sound discretion of the Labor Commissioner and trial courts in the first instance." (*Id.* at p. 998.) The court therefore remanded to the Labor Commissioner and the trial court to exercise their discretion in the first instance to determine whether to sever the contract and award compensation for services legally provided without a license. (*Id.* at pp. 982, 998–990; accord, *MKB Management, supra*, 184 Cal.App.4th at p. 804 [lack of real estate broker's license did not preclude severance of

services requiring license as a matter of law and severability may apply, in the discretion of the trial court].)

*Marathon* cited *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119 [70 Cal.Rptr.2d 304, 949 P.2d 1] (*Birbrower*), among others. "In [*Birbrower*], a law firm licensed in New York, but not California, provided legal services in both states. The trial court and Court of Appeal invalidated the entire attorney fee agreement, but we reversed in part, explaining that under the doctrine of severability the firm might be able to recover the fees it had lawfully earned by providing services in New York, notwithstanding its unlicensed provision of services in California. ([*Birbrower*,] at pp. 138–139.)" (*Marathon, supra*, 42 Cal.4th at p. 993, fn. omitted.)

In *Shopoff, supra*, 167 Cal.App.4th 1489, the appellate court concluded that "granting recovery under a contingent fee agreement although the charging lien may be invalid is consistent with the law of severability of contracts." (*Id.* at p. 1523.) The doctrine " 'preserves and enforces any lawful portion of a parties' contract that feasibly may be severed.' (*Marathon*[, *supra*, ] 42 Cal.4th 974, 991 . . . .)" (*Shopoff*, at p. 1523.) In *Shopoff*, the court concluded that rule 3-300 rendered the attorney's charging liens unenforceable, but did not taint or preclude recovery under valid contingent fee agreements. Violation of the rule in that instance did not render the underlying contracts invalid. (*Shopoff*, at pp. 1524–1525.)

 Here, of course, the court found that all the business agreements were voidable and held them unenforceable in their entirety. That determination was properly within the discretion of the trial court and Fair does not challenge it. In such circumstances, the doctrine of severance does not apply as there is no lawful portion of the agreements themselves that can be severed. The court also found that all services rendered by Fair were "part and parcel of those unenforceable business transactions" and could not be separated from them. That determination, too, was supported by the evidence. The court recognized that Fair's proposal to prove the value of his services by reference to discussions of the parties as co-owners of the business further supported its determination that the services provided by Fair were all in support of the business transactions and could not be separated into lawful and unlawful activities.

C. *Huskinson*

In determining whether Fair's conduct warranted denial of quantum meruit recovery in this case, we look for guidance from *Huskinson, supra*, 32 Cal.4th 453, a case relied upon by both Fair and respondents. In *Huskinson*, the

California Supreme Court held that quantum meruit was available where a law firm's violation of rule 2-200 rendered the fee-sharing agreement between two firms unenforceable. (*Huskinson*, at pp. 456, 463.) Rule 2-200 bars law firms from fee sharing if the client has not given written consent to the agreed division after a full written disclosure of its terms. (*Huskinson*, at pp. 456, 463.) The dispute in *Huskinson* was between the two law firms and the court emphasized that the decision did not increase the attorney fees paid or owed by the unconsenting client. (*Ibid.*) The court relied upon the "language and intent of [the rule, and] analogous statutory and case law providing that attorneys may recover in quantum meruit for the reasonable value of their legal services from their clients when their contractual fee arrangements [were] found to be invalid or unenforceable . . . ." (*Huskinson*, at p. 456; cf. *Strong v. Beydoun, supra*, 166 Cal.App.4th 1398, 1404 ["[a]llowing an attorney to recover the reasonable value of his or her services from a client is premised on the services being requested by the client"].)[16]

*Huskinson* looked to the purpose of the rule and determined that "rule 2-200 does not purport to restrict attorney compensation on any basis other than a division of fees. Nor does it suggest that attorneys or law firms are categorically barred from making or accepting client referrals, from agreeing to a division of labor on a client's case, or from actually working on a case where labor is divided." (*Huskinson, supra*, 32 Cal.4th at p. 458.) Next, the court expressed its understanding that the award of quantum meruit for services rendered in reliance on a fee-sharing agreement that lacks written client consent did not constitute a division of fees within the rule's contemplation, as "such an award involves no apportionment of the fees that the client paid or has agreed to pay . . . ." (*Id.* at p. 459.) Nor would allowing recovery in quantum meruit undermine compliance with rule 2-200, as attorneys who negotiate contingent fee-sharing agreements "prefer to receive their negotiated fees rather than the typically lesser amounts representing the reasonable value of the work performed." (32 Cal.4th at p. 460.) Thus, law firms remain "fully motivated to see that all of their future fee-sharing agreements comply with rule 2-200." (*Ibid.*) Moreover, analogous statutes regulating fee arrangements between attorneys and clients favored the availability of quantum meruit recovery. *Business and Professions Code sections 6147* (requiring attorneys who represent clients on a contingent fee basis to obtained signed, written fee agreements) *and 6148* (generally requiring attorneys in noncontingent fee cases to obtain signed, written contracts from clients reflecting rates, fees, and charges where it is reasonably foreseeable that legal expenses will exceed $1,000) *both specify that where an agreement is voided for failure to*

---

[16] In *Strong v. Beydoun, supra*, 166 Cal.App.4th at page 1404, the court barred an attorney who had entered into a fee-sharing agreement with another attorney without meeting the client consent requirements of rule 2-200 from seeking the reasonable value of her services directly from the *client*, rather than from the other attorney.

*comply with the statutory requisites, "the attorney remains 'entitled to collect a reasonable fee.' (Bus. & Prof. Code, §§ 6147, subd. (b), 6148, subd. (c).)"* (*Huskinson,* at p. 460, italics added.) Further, "[p]ermitting quantum meruit recovery as between law firms [was] consistent with case law holding or otherwise recognizing that attorneys˙ may recover from their clients the reasonable value of their legal services when their fee contracts or compensation agreements are found to be invalid or unenforceable for other reasons. (See, e.g., *Calvert v. Stoner* (1948) 33 Cal.2d 97 [199 P.2d 297] (*Calvert*); *Rosenberg v. Lawrence* (1938) 10 Cal.2d 590 [75 P.2d 1082] (*Rosenberg*); *Wiley v. Silsbee* (1934) 1 Cal.App.2d 520 [36 P.2d 854] (*Wiley*).)" (*Huskinson,* at p. 461.)[17]

*Huskinson* observed that, although the Supreme Court had "approved rule 2-200 in order 'to protect the public and to promote respect and confidence in the legal profession' [citation], and although the rule is binding on attorneys [citation], attorneys do not act in violation of an express statutory prohibition when providing legal services pursuant to a fee-sharing agreement lacking written client consent. Where services are rendered under a contractual compensation arrangement that is unenforceable as against public policy, but the subject services are not otherwise prohibited, quantum meruit may be allowed. [Citations.]" (*Huskinson, supra,* 32 Cal.4th at p. 463.) The court reemphasized that "rule 2-200 does not purport to categorically prohibit attorneys from making or accepting client referrals, from agreeing to divide the labor on a client's case, or from working on cases with attorneys from other law firms. By its terms, the rule merely bars attorneys who engage in such conduct from dividing client fees among themselves when certain requirements, such as written client consent to the fee division, have not been met." (*Ibid.*)

*Huskinson* acknowledged and distinguished "cases in which courts have disallowed quantum meruit recovery to attorneys who violated one˙ of the Rules of Professional Conduct. *Those cases, however, involved violations of a*

---

[17] *Calvert v. Stoner, supra,* 33 Cal.2d 97, *Rosenberg v. Lawrence, supra,* 10 Cal.2d 590, and *Wiley v. Silsbee, supra,* 1 Cal.App.2d 520, involved provisions in fee agreements that were unenforceable as against public policy. None appears to have concluded that the attorney committed a serious breach of the attorney's fiduciary duties toward the client or had a conflict of interest in representing the client. Nor were there trial court findings that the attorney had unduly influenced the client. (See also *Birbrower, supra,* 17 Cal.4th 119, 135–136 [quantum meruit claim remains, despite unauthorized practice of law in Cal. in violation of statute]; *Pringle v. La Chapelle* (1999) 73 Cal.App.4th 1000, 1006–1007 [87 Cal.Rptr.2d 90] [affirming a fee award despite allegedly invalid former rule 3-310(E) conflict waiver, where the record was inadequate to allow determination "if the purported violation of the rules was serious, if any act was inconsistent with the character of the profession, or if there was an irreconcilable conflict [between the two clients]"].) The rule violation in *Pringle* was characterized as "a minor technical violation of [former] rule 3-310(E)" in *A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1079 [6 Cal.Rptr.3d 813].

*rule that proscribed the very conduct for which compensation was sought, i.e., the rule prohibiting attorneys from engaging in conflicting representation or accepting professional employment adverse to the interests of a client or former client without the written consent of both parties.* (E.g., *Jeffry v. Pounds*[, *supra,*] 67 Cal.App.3d 6, 12 . . . [barring quantum meruit recovery from the time that attorney undertook to represent a wife in her marital dissolution proceedings against her husband, the current client of the attorney's law firm, in violation of former rule 5-102, a predecessor to rule 3-310]; *Goldstein v. Lees* (1975) 46 Cal.App.3d 614 [120 Cal.Rptr. 253] [finding quantum meruit recovery inappropriate where former corporate counsel labored under a conflict of interest in representing a minority shareholder and director of his former client in a proxy battle, in violation of predecessor rule to rule 3-310].)" (*Huskinson, supra,* 32 Cal.4th at p. 464, italics added.) *Huskinson* reasoned that, in the case of the rule 2-200 violation before it, the rule did not bar the services the plaintiff rendered on the client's behalf; it simply prohibited the dividing of the client's fees. (*Huskinson,* at p. 464.)

■ As did the trial court below, we read *Huskinson, supra,* 32 Cal.4th 453, as recognizing a distinction between the type of violations that may render an agreement voidable, but still allow the attorney compensation for the reasonable value of his or her services, and the type of violation that precludes such recovery: Attorneys who violate a rule of professional conduct *may* recover in quantum meruit where they do not act in violation of an express statutory prohibition when providing legal services and where the subject services are not otherwise prohibited. (*Id.* at p. 463.) On the other hand, violation of a rule that constitutes a serious breach of fiduciary duty, such as a conflict of interest that goes to the heart of the attorney-client relationship, warrants denial of quantum meruit recovery. (*Ibid.;* see also *Clark v. Millsap* (1926) 197 Cal. 765, 785 [242 P. 918] [suggesting that a serious violation warrants forfeiture of fees[18]]; *Pringle v. La Chapelle, supra,* 73 Cal.App.4th 1000, 1005–1006 [attorney's breach of a rule of professional conduct *may* negate an attorney's claim for fees, but does not *automatically* preclude attorney from obtaining fees[19]]; *Cal Pak Delivery, Inc. v. United*

---

[18] " 'Fraud or unfairness on the part of the attorney will prevent him from recovering for services rendered; as will acts in violation or excess of authority, and acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties.' [Citation.]" (*Clark v. Millsap, supra,* 197 Cal. at p. 785.)

[19] The *Pringle* court noted that its decision was in accord with "Hazard and Hodes, The Law of Lawyering (1998 supp.) section 1.5:108, page 108 (an attorney fee may be subject to forfeiture as a 'sanction for gross abuse by the lawyer of obligations to the client, or other serious violations of the law of lawyering . . .')" and with the Proposed Final Draft of the Restatement Third of The Law Governing Lawyers. (*Pringle v. La Chapelle, supra,* 73 Cal.App.4th at p. 1006, fn. 5.) Section 37 of the Restatement currently provides: "A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all

*Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 15–16 [60 Cal.Rptr.2d 207] (*Cal Pak*) ["a court may prevent counsel's recovery of fees from the client where the attorney has violated ethical rules; whether through fraud, acts incompatible with the faithful discharge of duties or wrongful abandonment of the client"].)

Here, the court found that "by entering into the subject business transactions, [Fair] knowingly acquired an ownership interest adverse to his clients, Mr. Bakhtiari and the Stonesfair entities, without making the requisite disclosure in writing and without obtaining the requisite written consent, and such created an inherent conflict of interest between Mr. Fair and his clients. All of the services that Mr. Fair thereafter rendered were part and parcel of those unenforceable business transactions, and I thus cannot conclude that they were, 'not otherwise prohibited.' " The court also expressed its concern that, when it looked to the purpose of rule 3-300 and how Fair was proposing to prove the value of the services, it saw Fair "back-dooring the fact that the business agreements have been voided and no longer exist."

Fair focuses too narrowly on the actual services he rendered, characterizing them as real estate, business and legal services regularly and lawfully provided. We reject Fair's suggestion that the rule violation that the court found to be a breach of his fiduciary duties occurred at the time he went into business with Bakhtiari and set up the corporations, but that after that point, the services he rendered did not violate any public policy. Although cases support the notion that Fair may be able to recover in quantum meruit for services rendered *before* breach of his fiduciary duties (e.g., *Jeffry v. Pounds, supra,* 67 Cal.App.3d at p. 12; *Cal Pak,* 52 Cal.App.4th at pp. 15–16), no case cited stands for the proposition that where the breach or conflict of interest is serious enough to warrant the denial of fees, that fees may nevertheless be recovered at some point *after* the breach.

Unlike rule 2-200 at issue in *Huskinson, supra,* 32 Cal.4th 453, which did not restrict attorney compensation on any basis *other* than fee sharing and which did not suggest that attorneys or law firms were categorically barred from making or accepting client referrals, from agreeing to a division of labor on a client's case, or from actually working on a case where labor is divided (*id.* at p. 458), rule 3-300 absolutely prohibits a member from entering into a business transaction with a client or knowingly acquiring a pecuniary interest adverse to a client, unless the transaction is fair *and* the full written disclosure and consent requirements of the rule are met. All services

of the lawyer's compensation for the matter. Considerations relevant to the question of forfeiture include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies." (Rest.3d Law Governing Lawyers, § 37.)

rendered by Fair to Bakhtiari and the Stonesfair entities in furtherance of their business relationship were subject to the requirements of the rule. Fair's rule violation was not a single point in time that can be separated out from the balance of his representation and work with Bakhtiari and the Stonesfair entities. He violated the rule each time he conducted a transaction with Bakhtiari and the Stonesfair entities without complying with the requirements of the rule. The court could properly find that Fair's rule violation and the ongoing breach of his fiduciary duty permeated his business relationship with cross-complainants, causing continued conflict between him and Bakhtiari.

*Huskinson, supra,* 32 Cal.4th 453, reasoned that the award of quantum meruit for services rendered in reliance on the voided fee-sharing agreement would not constitute an action within the contemplation of rule 2-200, and would not undermine compliance with the rules. (32 Cal.4th at pp. 459–460.) We cannot say the same here. The purpose of rule 3-300 is to prohibit absolutely attorneys from entering into business transactions with clients, absent full written disclosure and written client consent. The underlying concerns of the rule are avoiding the potential and actual conflicts of interest between attorneys and their clients that also animate the rule's statutory counterpart, section 16004.

Although Fair contends he and others in his position would certainly rather have the voided ownership interests in the businesses and compensation under the voided agreements than quantum meruit recovery, this contention is belied by the manner in which he intends to prove the reasonable value of his services—by testimony and evidence as to the history of the parties' negotiations and agreements relating to the value of his services. In short, he proposed an "end run" around the court's having voided the agreements by seeking to recover most of the same sums to which he claimed entitlement under the agreements through a quantum meruit cause of action. In hindsight, one might argue Fair would rather have had the voided ownership interests in the Stonesfair entities. However, allowing quantum meruit recovery in these circumstances could significantly undermine the rule. At the outset of an attorney-client business relationship, the incentive to make a full and reasonably understandable written disclosure (including disclosure of the right to seek independent advice) and to secure the client's written consent to the terms of the transaction will be minimized if the attorney knows that even if the agreements are later voided, the reasonable value of the services rendered may be established by the understandings contained in the voided agreements and that the value of those services, as Fair contended below, may be measured by the success of the businesses entered into in violation of the rule and in breach of the attorney's fiduciary duties. (Cf. *Fergus v. Songer* (2007) 150 Cal.App.4th 552, 572–573 [59 Cal.Rptr.3d 273] [Quantum meruit recovery was specifically allowed under the governing statute (Bus. & Prof. Code, § 6147) and could be proved by evidence of the amount involved and the

results obtained. However, the deterrent and protective purposes of the statute requiring that a contingency fee agreement must include a statement that the fee is not set by law, but is negotiable between the client and attorney, would be impaired if an attorney barred from enforcing the contingency fee agreement could argue he or she was entitled to a percentage of the recovery based on the contingent risk factor].)

*Huskinson* also reasoned that although rule 2-200 is binding on attorneys, "attorneys do not act in violation of an *express statutory prohibition* when providing legal services pursuant to a fee-sharing agreement lacking written client consent." (*Huskinson, supra,* 32 Cal.4th at p. 463, italics added.) Although the contractual compensation arrangement in *Huskinson* was unenforceable as against public policy, the subject services were not otherwise prohibited. (*Ibid.*) In the instant case, it is not simply a provision of the contractual compensation arrangement that violates the rule. Rather, the entire business relationship and all the business transactions encompassed therein, were barred, absent compliance with the rule. Moreover, here, the violation of rule 3-300 also constituted a violation of its statutory complement (§ 16004) prohibiting a fiduciary from obtaining an advantage from the beneficiary. Consequently, Fair acted in violation of an express statutory prohibition when he provided legal and other services without first making the required written disclosures and obtaining the required written consents.

Further, *Huskinson* relied upon the existence of statutes analogous to rule 2-200, regulating fee arrangements between attorneys and clients, and expressly providing that where the fee agreement is voided for failure to comply with the statutory requisites, "the attorney remains 'entitled to collect a reasonable fee.' (Bus. & Prof. Code, §§ 6147, subd. (b), 6148, subd. (c).)" (*Huskinson, supra,* 32 Cal.4th at p. 460.) No similar statute exists in the context of this case.

After *Huskinson,* several cases have addressed the question of quantum meruit recovery where the underlying agreement had been voided.

In *Selten v. Hyon* (2007) 152 Cal.App.4th 463 [60 Cal.Rptr.3d 896] (*Hyon*), the court held that a contract calling for Selten, a nonattorney "case manager," to engage in the unauthorized practice of law and to provide attorney referral services unlawful under Business and Professions Code section 6155 was illegal and unenforceable in its entirety. Relying upon *Huskinson, supra,* 32 Cal.4th 453, 463, the court held that Selten could not recover for the reasonable value of his unlawful attorney referral services, his unauthorized practice of law (if any), or other unlawful conduct, but that he might recover the reasonable value of services he lawfully rendered, should the trial court determine there were any. (*Hyon,* at pp. 471–472.) *Hyon* distinguished

*Bennett v. Hayes* (1975) 53 Cal.App.3d 700, 701–702 [125 Cal.Rptr. 825], in which the plaintiff mechanic had sought to recover for services he had provided in violation of the statutory requirement that he give customers a written estimate before commencing work on the basis that *"the repair work for which the plaintiff sought to recover was itself illegally performed, because he had not provided a written estimate." (Hyon*, at p. 472, italics added.) In contrast, the *Hyon* court was "not permitting Selten to have his illegal objects carried out. Rather, [it allowed] him to pursue his claim with respect to services he lawfully provided." (*Id.* at p. 473.) The question on remand was "whether all, some, or none of the services (other than attorney referral) that Selten actually provided were illegal." (*Ibid.*)

In the instant case, the trial court determined that all of the services provided by Fair were rendered in violation of rule 3-300 and in breach of his fiduciary duties to his clients.

In a case following *Hyon* that involved many of the same parties, *Shopoff, supra*, 167 Cal.App.4th 1489, the court concluded that the holding of *Hyon, supra*, 152 Cal.App.4th 463, bound Selten and barred him from recovering any part of his contingent fee share of the proceeds of the recovery obtained in the underlying litigation. (*Shopoff*, at p. 1517.) The client, Hyon, was also "bound by the determination that Selten may be entitled to recover the reasonable value of the lawful work he performed—that is, other than unlawful attorney referral services or any unauthorized practice of law—as determined on remand." (*Id.* at pp. 1517–1518, fn. omitted.)

*Shopoff* also addressed a question that *Fletcher v. Davis* (2004) 33 Cal.4th 61, 70 [14 Cal.Rptr.3d 58, 90 P.3d 1216] (*Fletcher*) had expressly declined to decide: " 'whether rule 3-300 applies to a contingency-fee arrangement coupled with a lien on the client's prospective recovery in the same proceeding.' [Citation.]" (*Shopoff, supra*, 167 Cal.App.4th at p. 1522.) In *Fletcher*, the Supreme Court held that a charging lien securing an attorney's payment of hourly legal fees and costs of litigation was an interest "adverse" to the client, and therefore subject to the requirements of rule 3-300 requiring the client's informed written consent. (*Fletcher*, at pp. 64, 69, 71.) Accordingly, *Fletcher* refused to allow the lien to be enforced in the proceeding. (*Id.* at p. 72.) *Shopoff* reasoned that *even if* the "rule announced in *Fletcher* extends to liens attached to contingency fee agreements, only the *liens* asserted by respondents would be unenforceable. ([*Fletcher*,] at pp. 71–72.) *Fletcher* did not state that noncompliance with rule 3-300 invalidates an underlying fee

agreement or precludes an attorney from recovering a specified contractual fee." (*Shopoff*, at p. 1523.)[20]

Unlike the instant case, in *Shopoff*, as in *Fletcher*, the underlying fee agreement was preserved. Only the charging lien was voided. The only *adverse interest* found was the charging lien itself, and that was easily severed from the agreement as a whole. Here, not only was the agreement voided entirely, but the entire attorney-client business relationship was tainted by the failures to disclose and to obtain written client consent, and the court expressly found undue influence throughout the existence of the business relationship and a breach of fiduciary duties under section 16004.

In *Fergus v. Songer, supra,* 150 Cal.App.4th 552, 570, the court held that a contingency fee agreement and a subsequent letter modifying the agreement were voidable at the option of the client, where they did not comply with the statutory requirement that a contingency fee agreement must include a statement that the fee is not set by law, but is negotiable between the attorney and the client. (Bus. & Prof. Code, § 6147, subds. (a)(4), (b).) Business and Professions Code section 6147, subdivision (b), provided in such circumstances that "the attorney shall thereupon be entitled to collect a reasonable fee." Because it found the agreement voidable under Business and Professions Code section 6147, subdivision (b), the appellate court expressly found it unnecessary to determine whether the violation of rule 3-300 in the circumstances constituted a breach of the attorney's fiduciary duties within the meaning of section 16004. (*Fergus*, at p. 570, fn. 6.) *Fergus*, like *Huskinson, supra,* 32 Cal.4th 453, is distinguishable as in this case there is no relevant statute authorizing recovery of the reasonable value of services for the identified violations. Moreover, unlike those cases allowing quantum meruit recovery, in this case, the court made express findings of undue influence and breaches of fiduciary duties.

In *MKB Management, supra,* 184 Cal.App.4th 796, the appellate court concluded that a property management company's lack of a real estate broker's license did not bar its quantum meruit claim for services that did not require a real estate broker's license. Again, as in *Huskinson* and in licensing cases such as *Hyon*, *MKB Management* contains no indication of undue

---

[20] The courts in both *Shopoff* and *Fletcher* took note of an opinion of the Los Angeles County Bar Association, suggesting that rule 3-300 did *not* apply in the contingent fee contract circumstance. (*Fletcher, supra,* 33 Cal.4th at p. 70, fn. 3; *Shopoff, supra,* 167 Cal.App.4th at pp. 1522–1523.) Recently, the Court of Appeal in *Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38 [108 Cal.Rptr.3d 455], answered the question left open in *Shopoff* and *Fletcher*, holding that " '[t]he inclusion of a charging lien in the initial contingency fee agreement does not create an "adverse interest" to the client within the meaning of rule 3-300 . . . .' " (*Plummer v. Day/Eisenberg, LLP*, at pp. 48–49, relying upon State Bar Standing Com. on Prof. Responsibility & Conduct, Formal Opn. No. 2006-170, p. 7.)

influence or a serious breach of fiduciary duties by the party seeking quantum meruit. Services lawfully provided could be identified. Here, the court determined that all of the services provided by Fair were rendered in violation of rule 3-300 and in breach of his fiduciary duties to his clients.

■ Cases disallowing compensation entirely generally have involved a serious violation of ethical rules or statutes, such that it can be said the "services [were] rendered in contradiction to the requirements of professional responsibility. . . . 'Fraud or unfairness on the part of the attorney will prevent [the attorney] from recovering for services rendered; *as will . . . acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties.*' (Italics added.) [Citations.]" (*Goldstein v. Lees, supra*, 46 Cal.App.3d 614, 618.) As we observed in *Cal Pak, supra*, 52 Cal.App.4th 1: "The rule that an attorney who engages in conflicting representation without obtaining informed consent is not entitled to compensation is not based on the premise that the attorney must pay a penalty so much as on the principle that 'payment is not due for services not properly performed.' [Citation.]" (*Id.* at p. 14, fn. 2.) "[T]here is no force to the objection that the [denial of attorney fees] will work a windfall for [the former client]. . . . [I]t is enough to say that '[c]ourts do not sit to give effect to . . . illegal contracts.' " (*Goldstein v. Lees*, at pp. 623–624.)

*Goldstein v. Lees, supra*, 46 Cal.App.3d 614 and *Jeffry v. Pounds, supra*, 67 Cal.App.3d 6, denied counsel any attorney fees where the attorneys failed to comply with the rule requiring informed written consent before representing clients with conflicting interests, relying in part on the predecessor to rule 3-310(E).[21] *Goldstein* held that representation of a minority shareholder in a proxy fight was "improper" where attorneys had formerly represented the corporation. Not only was the contract between counsel and the minority shareholder client "void for reasons of public policy" (*Goldstein v. Lees*, at p. 617; see *id.* at pp. 618–619 & fn. 3, 623), but even if the proxy fight was consistent with the interests of the corporation, the *employment* of the attorney was adverse to the interests of the former client. According to the court, the rule "operates to preclude any impediment to the fulfillment of an attorney's professional obligation to his client by proscribing any conflict of interest in his representation of past and present clients. ' "It is better to remain on safe and secure professional ground, to the end that the ancient and honored profession of the law and its representatives may not be brought into disrepute. Courts have consistently held the members of the profession to the

---

[21] Rule 3-310, titled "Avoiding the Representation of Adverse Interests," provides in subdivision (E): "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

strictest account in matters affecting the relation of attorney and client." ' [Citation.]" (*Id.* at p. 620, fn. omitted.)

In *Jeffrey v. Pounds, supra,* 67 Cal.App.3d 6, attorneys undertook to represent a former personal injury client's wife in dissolution proceedings without complying with the rule. Although the court took pains to state it did "not charge [counsel] with dishonest purpose or deliberately unethical conduct," it nevertheless denied fees other than for services supplied *before* the breach of professional conduct. (*Id.* at p. 11.)

In *A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli, supra,* 113 Cal.App.4th 1072, a law firm sued its former client on behalf of a new client. The former client moved to disqualify the firm based on its alleged violation of rule 3-310(E). The trial court granted the motion and in a later suit against the firm by the new client, the court held that the firm was not entitled to *any* fees, because of the firm's disqualifying violation of an ethical obligation. (*A.I. Credit Corp.,* at p. 1079.) The Court of Appeal affirmed, holding that the disqualification was not based on a "mere technical violation of ethical rules asserted after the fact. The trial court determined that there was a disqualifying violation of ethical obligations." (*Ibid.*) The court quoted from *Goldstein* and from our opinion in *Cal Pak*: " 'It is settled in California that an attorney may not recover for services rendered if those services are rendered in contradiction to the requirements of professional responsibility.' (*Goldstein v. Lees*[*, supra,*] 46 Cal.App.3d 614, 618 . . . .) '[A] court may prevent counsel's recovery of fees from the client where the attorney has violated ethical rules; whether through fraud, acts incompatible with the faithful discharge of duties or wrongful abandonment of the client.' (*Cal Pak*[*, supra,*] 52 Cal.App.4th 1, 15–16 . . . .)" (*A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli,* at p. 1076.)

It is true that some of the cases denying fee recovery for an attorney's breach of ethical obligations, such as *Day v. Rosenthal, supra,* 170 Cal.App.3d 1125 and *Conservatorship of Chilton, supra,* 8 Cal.App.3d 34, involve conflicts of interest and breaches of fiduciary duties amounting to fraud and more egregious than that here. Nevertheless, we reject Fair's suggestion that counsel engaging in conduct short of fraud is necessarily entitled to recover the reasonable value of the services provided, regardless of the seriousness of the rule violation or fiduciary breach and regardless of whether it places counsel in an inevitable conflict of interest with the client. As observed by our Supreme Court, not only fraud will prevent an attorney from recovering for services rendered, but also " 'acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties.' [Citation.]" (*Clark v. Millsap, supra,* 197 Cal. at p. 785.)

## D. *Substantial evidence supports findings*

The evaluation of the seriousness of the conflicts of interest that arose between Fair and his clients as a result of Fair's breaches of these fiduciary duties was for the trial court in the first instance. (*Sullivan v. Dorsa* (2005) 128 Cal.App.4th 947, 965–966 [27 Cal.Rptr.3d 547].)[22] Here, substantial evidence supports the trial court's findings that the material terms and conditions of the business transactions engaged in by Fair, Bakhtiari and the Stonesfair entities were not fully explained to and understood by Bakhtiari at the time. The evidence further supports the court's findings that Fair violated rule 3-300 and breached his fiduciary duties to Bakhtiari and the Stonesfair entities under section 16004 by going into business with them and engaging in numerous transactions as part of that business relationship, without ever making the full disclosures and securing the consents required by the rule and the statute. The court found that Fair's violations "created an inherent conflict of interest between Mr. Fair and his clients." We will not substitute our judgment for the court's. The trial court also found that all of the services that Fair rendered were "part and parcel of those unenforceable business transactions" and, therefore, that it could not find the subject services "[were] not otherwise prohibited" under *Huskinson, supra,* 32 Cal.4th at page 463. Such findings were well supported by the evidence and were within the court's discretion. Absent the required disclosures and consents, by entering into and conducting business transactions with his clients, Fair breached his fiduciary duties to them and he violated rule 3-300—the ethical rule that "proscribed the very conduct for which compensation was sought." (*Huskinson,* at p. 463.)

■ Unlike those rule violations in which counsel has been allowed to recover the reasonable value of services rendered and which involved no serious breach of fiduciary duty, the court could well determine that Fair's conduct here was so fundamentally at war with rule 3-300 and section 16004, that it infected the entire relationship between Fair and his clients, and that Fair's breach of his fiduciary duties under the statute was therefore sufficiently serious as to warrant the denial of quantum meruit recovery.

We conclude the court did not abuse its discretion in denying Fair leave to amend his complaint to assert a cause of action for quantum meruit.

---

[22] In *Sullivan v. Dorsa, supra,* 128 Cal.App.4th 947, the appellate court refused to substitute its judgment for the trial court where the trial court found the attorney was entitled to fees because "the [plaintiffs] fail[ed] to show that any violation of the rules governing representation of adverse interests was *serious* enough to *compel* a forfeiture of fees. Insofar as these questions were entrusted either to the trial court's discretion or its factfinding powers, we cannot substitute our judgment for the trial court's except on a clear showing that those powers were abused." (*Id.* at pp. 965–966.)

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs in connection with this appeal.

Haerle, J., and Richman, J., concurred.