[No. S114715. June 10, 2004.]

FREDDIE FLETCHER, Plaintiff and Appellant, v.
CARLYLE DAVIS et al., Defendants and Respondents.

**COUNSEL**

Freddie Fletcher, in pro. per., for Plaintiff and Appellant.

Latham & Watkins, Susan S. Azad and Kathryn M. Davis for Defendants and Respondents Carlyle Davis, TransCoast Financial Inc. Defined Benefit Trust, Carlyle Davis and Barbara Davis as Trustees of TransCoast Financial Inc. Defined Benefit Trust and TransCoast Financial Inc.

Gernsbacher & Associates and David Gernsbacher for Defendants and Respondents Arthur Gilbert and David Gernsbacher.

Stocker & Lancaster and Jay F. Stocker for Defendant and Respondent Master Washer & Stamping Co., Inc.

Fischbach & Fischbach and Joseph Fischbach for Defendant and Respondent Joseph Fischbach.

## OPINION

**BAXTER, J.**—When an attorney wishes to secure payment of hourly legal fees and costs of litigation by obtaining a charging lien against a client's future recovery, must the attorney obtain the client's consent in writing? We conclude that rule 3-300 of the Rules of Professional Conduct of the State Bar of California (rule 3-300), which requires the client's informed written consent to the attorney's acquisition of an interest adverse to the client, applies to such a transaction and therefore reverse in part the judgment of the Court of Appeal.

### BACKGROUND

Because this case reaches us after the trial court sustained defendants' demurrer, we assume the facts alleged in plaintiff's complaint are true.

In November 1995, Master Washer & Stamping Co., Inc. (Master Washer), was evicted for nonpayment of rent. Subsequently, David Gernsbacher, the attorney for landlord Arthur Gilbert, filed a lawsuit against Master Washer for breach of the lease. He also refused to allow Master Washer to retrieve its equipment, which was Master Washer's only asset. Without it, Master Washer could not conduct its business. Master Washer retained plaintiff, attorney Freddie Fletcher, to defend the breach-of-lease action and to institute a conversion action for damages. Master Washer orally agreed to pay all costs plus Fletcher's fee of $200 per hour. In lieu of a cash retainer, Master Washer agreed to grant Fletcher a lien on any judgment or settlement in its litigation with Gilbert. If the judgment or settlement was insufficient, Master Washer agreed to pay the difference from the income it earned once it resumed operations. Master Washer also promised Fletcher a "bonus" of an unspecified percentage of any judgment obtained against Gilbert if extensive litigation or trial was required and if the recovery in the case was "large."

Fletcher prepared and filed a complaint for conversion against Gilbert and Gernsbacher. Prior to filing the complaint, Fletcher sent Master Washer a memorandum setting forth his understanding of the terms of their oral retainer agreement. Master Washer's president, William Scallon, represented to Fletcher that he would sign a written retainer agreement, but never did so. The suits between Gilbert and Master Washer were consolidated.

While the Gilbert/Master Washer litigation was pending, Fletcher agreed to do additional, personal legal work on behalf of Scallon and Scallon's mother. In each matter, Scallon, on behalf of Master Washer, orally granted Fletcher a lien on Master Washer's prospective recovery against Gilbert in the conversion action.

In Master Washer's conversion action against Gilbert and Gernsbacher, Gernsbacher obtained a summary judgment. In Gilbert's action against Master Washer for breach of lease, Gilbert and Master Washer entered into an agreement under which Master Washer admitted liability to Gilbert for breach of the lease and stipulated a judgment be entered against it and in favor of Gilbert for $85,000 in damages. (*Gilbert v. Master Washer & Stamping Co.* (2001) 87 Cal.App.4th 212, 214–215 [104 Cal.Rptr.2d 461].) Master Washer's conversion action against Gilbert was tried to a jury and resulted in a mistrial. As Fletcher prepared for a second trial, Master Washer discharged him and replaced him with defendant Joseph Fischbach. Scallon also discharged Fletcher from the other legal matters Fletcher was handling on behalf of Scallon and his mother.

The second trial of Master Washer's conversion action against Gilbert resulted in a judgment in favor of Master Washer in the sum of $504,000 plus interest.

Eleven days after entry of judgment in favor of Master Washer in its conversion action against Gilbert, defendant Carlyle Davis filed a collection suit against Gilbert, Master Washer, and Scallon, seeking to stay disbursement of the judgment proceeds and to satisfy, from that recovery, criminal restitution and civil judgments he held against Scallon. The trial court issued a temporary restraining order prohibiting Scallon's diversion of the proceeds from the Master Washer judgment against Gilbert. The following day, Gilbert deposited in the Davis collection action the sum of $618,194.10, representing the amount of the Master Washer judgment plus accrued interest. A few weeks later, the parties to the Davis action and others claiming an interest in the Master Washer judgment stipulated to a disbursement of the judgment in specified amounts to Davis, Gilbert, Master Washer, and Fischbach. The trial court approved the stipulation and ordered the Master Washer judgment disbursed accordingly. Under the stipulation, nearly all the judgment proceeds were disbursed to Davis, Gilbert, Master Washer, and Fischbach.

Fletcher alleges that he did not learn about the Davis action or the stipulated disbursement of the Master Washer judgment until the day after the funds had been disbursed. Fletcher then filed this action against Master Washer, Davis, Fischbach, Gilbert, and Gernsbacher, alleging that defendants were on notice of his lien at the time they stipulated to the disbursement of the proceeds from the Master Washer judgment.

The trial court sustained the demurrers of Davis, Fischbach, Gilbert, and Gernsbacher and dismissed the action as to them on the grounds Fletcher did not and could not plead facts showing the perfection of a lien on the Master

Washer judgment or that the defendants had knowledge of such a lien.[1] The Court of Appeal reversed, holding that Fletcher's lien did not have to be in writing to be valid and that Fletcher did not have to obtain a judgment as to the existence and amount of the lien before asserting a lien on the Master Washer recovery. We granted review.

## DISCUSSION

■ "A lien is a charge imposed in some mode other than by a transfer in trust upon specific property by which it is made security for the performance of an act." (Civ. Code, § 2872.) An attorney's lien "upon the fund or judgment which he has recovered for his compensation as attorney in recovering the fund or judgment . . . is denominated a 'charging lien.' " (*Goodrich v. McDonald* (N.Y. 1889) 19 N.E. 649, 651 [112 N.Y. 157].) A charging lien may be used to secure either an hourly fee or a contingency fee. (*Cetenko v. United California Bank* (1982) 30 Cal.3d 528, 531–532 [179 Cal.Rptr. 902, 638 P.2d 1299].)

In most jurisdictions, a charging lien is established by operation of law in favor of an attorney to satisfy attorney fees and expenses out of the proceeds of a prospective judgment. (*City of Los Angeles v. Knapp* (1936) 7 Cal.2d 168, 173 [60 P.2d 127]; *Wagner v. Sariotti* (1943) 56 Cal.App.2d 693, 697 [133 P.2d 430].) But in California, with a few exceptions not pertinent here (see 1 Witkin, Cal. Procedure (4th ed. 1996) Attorneys, § 194, pp. 249–250), "an attorney's lien is created only by contract . . . . Unlike a service lien or a mechanic's lien, for example (Civ. Code, §§ 3051, 3110), an attorney's lien is not created by the mere fact that an attorney has performed services in a case." (*Carroll v. Interstate Brands Corp.* (2002) 99 Cal.App.4th 1168, 1172 [121 Cal.Rptr.2d 532]; see also *Haupt v. Charlie's Kosher Market* (1941) 17 Cal.2d 843, 845 [112 P.2d 627].)

Fletcher's complaint alleges that Master Washer orally granted him a charging lien for hourly attorney fees on any recovery Master Washer subsequently obtained from Gilbert in the conversion action. The trial court ruled that no valid lien existed because, under rule 3-300, a client must consent in writing to an attorney's charging lien against the client's future recovery. The Court of Appeal disagreed, holding that rule 3-300 was

---

[1] The trial court sustained the demurrer of Master Washer with leave to amend on the ground Fletcher had not pleaded a timely written notice to Master Washer of the right to arbitrate an attorney-client fee dispute, as required by Business and Professions Code section 6201. When Fletcher failed to amend his complaint within the allotted time, the trial court dismissed his action against Master Washer. That ruling, which was affirmed by the Court of Appeal, has not been challenged here.

inapplicable in that an attorney's charging lien is not "adverse" within the meaning of *Hawk v. State Bar* (1988) 45 Cal.3d 589 [247 Cal.Rptr. 599, 754 P.2d 1096] (*Hawk*).

Rule 3-300, which is entitled "Avoiding Interests Adverse to a Client," provides: "A member shall not . . . knowingly acquire an ownership, possessory, security, or other pecuniary interest *adverse* to a client, unless each of the following requirements has been satisfied: [¶] (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted *in writing* to the client in a manner which should reasonably have been understood by the client; and [¶] (B) The client is advised *in writing* that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and [¶] (C) The client thereafter consents *in writing* to the terms of the transaction or the terms of the acquisition." (Italics added.)

■ An attorney's charging lien is a "*security* interest" in the proceeds of the litigation. (*Isrin v. Superior Court* (1965) 63 Cal.2d 153, 158 [45 Cal.Rptr. 320, 403 P.2d 728]; see also *Wagner v. Sariotti, supra,* 56 Cal.App.2d at pp. 697–698.) Accordingly, the question here becomes whether Fletcher's charging lien was "adverse" to Master Washer. In making that determination, we must be mindful that " '[i]n civil cases, "there are no transactions respecting which courts . . . are more jealous and particular, than dealings between attorneys and their clients." ' " (*Eschwig v. State Bar* (1969) 1 Cal.3d 8, 16 [81 Cal.Rptr. 352, 459 P.2d 904].)

■ Although it is difficult to anticipate with precision the myriad of transactions that may arise between an attorney and a client, an attorney generally "must avoid circumstances where it is reasonably foreseeable that his acquisition may be detrimental, i.e., adverse, to the interests of his client." (*Ames v. State Bar* (1973) 8 Cal.3d 910, 920 [106 Cal.Rptr. 489, 506 P.2d 625] (*Ames*).) Under this standard, we have characterized as adverse an attorney's purchase of a note secured by a first deed of trust on property that was the subject of the litigation the attorney was engaged to pursue and on which the clients had a note secured by the second deed of trust (*Ames, supra,* 8 Cal.3d at pp. 918–920 [106 Cal.Rptr. 489, 506 P.2d 625]); an attorney's acquisition of a writ of execution against the husband's property to secure payment of fees in a domestic dispute and the attorney's subsequent decision to levy on his own writ instead of the writ of his client, the wife (*Silver v. State Bar* (1974) 13 Cal.3d 134, 139–140 [117 Cal.Rptr. 821, 528 P.2d 1157]); and an attorney's acquisition from the client of a note secured by a deed of trust in real property in order to secure payment of legal fees (*Hawk, supra,* 45 Cal.3d at pp. 593–594).

We have contrasted the above transactions with an unsecured promissory note, which "gives an attorney only a right to proceed against the client's assets in a contested judicial proceeding at which the client may dispute the indebtedness. The note allows the attorney to obtain a judgment, and to seek to enforce the judgment against the client's assets, if any. It does not give the attorney a *present* interest in the client's property which the attorney can summarily realize." (*Hawk, supra*, 45 Cal.3d at pp. 600–601.)

An attorney's charging lien on the proceeds of the litigation falls somewhere between these extremes. Defendants Davis and Fischbach argue that Fletcher's charging lien was adverse to Master Washer because, under *Ames, supra*, 8 Cal.3d at page 920, it was "reasonably foreseeable" that its acquisition by Fletcher could become detrimental to the client. However, Fletcher and the Court of Appeal use a different test. They contend that *Hawk* modified the "reasonably foreseeable" test such that only those transactions that permit the attorney to summarily extinguish the client's interest in the property are deemed adverse, relying in particular on this sentence from *Hawk, supra*, 45 Cal.3d at page 600: "Again, acquiring the ability to summarily *extinguish* the client's interest in property is what makes the acquisition 'adverse.' "

Fletcher and the Court of Appeal have misread *Hawk*, which nowhere criticized *Ames* and instead acknowledged explicitly that "[w]e have also said that an attorney who has obtained an interest in the property of a client where it is reasonably foreseeable that his acquisition may become detrimental to the client, even though his intention is to aid the client, has acquired an interest adverse to a client." (*Hawk, supra*, 45 Cal.3d at p. 599; see also *Connor v. State Bar* (1990) 50 Cal.3d 1047, 1057 [269 Cal.Rptr. 742, 791 P.2d 312].) That standard was triggered, we explained, when an attorney's " 'personal financial interest was in conflict with [his client's] interest in obtaining full repayment of its loan' " (*Hawk, supra*, at p. 599), when counsel had "acquired an interest in the subject matter of the litigation for which they had been retained" (*id.* at p. 600), and when a secured note "can be used to summarily extinguish the client's interest in the property." (*Ibid.*) Fletcher's proposed test would define only the last of these transactions as adverse. Plainly, the single sentence seized on by Fletcher merely described the adverse interest presented in that case. It did not purport to define what makes an interest adverse in all circumstances.

▮ Applying the correct test, we agree with Davis and Fischbach that it was reasonably foreseeable the charging lien could become detrimental to the client. Although a charging lien does not grant an attorney the power to summarily extinguish the client's interest in any recovery, a charging lien could significantly *impair* the client's interest by delaying payment of the

recovery or settlement proceeds until any disputes over the lien can be resolved. For example, when there is a dispute over the existence or amount of an attorney's charging lien, the attorney can prevent the judgment debtor or the settling party from remitting the recovery to the client until the dispute is resolved. (*Ex parte Kyle* (1851) 1 Cal. 331, 332 [an attorney with a charging lien "may stop the money *in transitu,* by giving notice to the opposite party not to pay it, until his claim for costs be satisfied, and then moving the court to have the amount of his costs paid to him in the first instance"]; see generally 7 Am.Jur.2d (1997) Attorneys at Law, § 342, p. 335 [charging lien grants attorney "the right to have the court interfere to prevent payment by the judgment debtor to the creditor in fraud of the attorney's right to it"].) Alternatively, when the settlement draft is made jointly payable to the client and the attorney, the attorney may refuse to endorse the check until the dispute is resolved.[2] (Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2003) ¶ 5:830, pp. 5-112 to 5-113 (rev. #1, 2003).) Even when the proceeds have been deposited in the client's trust account, the attorney may withhold an amount equivalent to the disputed portion. (*Id.,* ¶ 5:829, p. 5-112; Flahavan et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2003) ¶ 4:544, p. 5-238.4 (rev. #1, 2003).) In each of these instances when the charging lien is disputed, the client's recovery will be " 'tied up until everyone involved can agree on how the money should be divided . . . or until one or the other brings an independent action for declaratory relief.' " (*Carroll v. Interstate Brands Corp., supra,* 99 Cal.App.4th at p. 1176.)

In sum, a charging lien grants the attorney considerable authority to detain all or part of the client's recovery whenever a dispute arises over the lien's existence or its scope. That would unquestionably be detrimental to the client. (Cf. *Brockway v. State Bar* (1991) 53 Cal.3d 51, 64–65 [278 Cal.Rptr. 836, 806 P.2d 308] [an adverse interest exists where the fee arrangement "gives the attorney an ownership interest in client property that has a value *greater* than the amount absolutely agreed upon in fees" (italics added)].) A charging lien is therefore an adverse interest within the meaning of rule 3-300 and thus requires the client's informed written consent. Requiring the client's informed written consent has the additional benefit of ensuring that the client truly agrees to the creation of the lien and its scope, thus making it less likely that a disagreement will arise that could lead to litigation or other action adverse to the client, and also impressing upon the client the importance of his or her consent and of the right to withhold it. (Cf. *Chambers v. Kay* (2002) 29 Cal.4th 142, 157 & fn. 9 [126 Cal.Rptr.2d 536, 56 P.3d 645].)

---

[2] Indeed, the attorney *must* do so in order to preserve the charging lien. (*In the Matter of Feldsott* (Review Dept. 1997) 3 Cal. State Bar Ct. Rptr. 754, 758.)

Our construction of rule 3-300 finds additional support in the discussion note following the rule, which states that "[r]ule 3-300 is intended to apply where the member wishes to obtain an interest in client's property in order to secure the amount of the member's past due or future fees." (Discussion, 23 pt. 3 West's Ann. Codes, Court Rules (1996 ed.) Rules Prof. Conduct, foll. rule 3-300, p. 366.) A charging lien on a future recovery qualifies as an interest in the client's property designed to secure the member's fees.

Our construction is also supported by the State Bar of California's Standing Committee on Professional Responsibility and Conduct, which concluded in a formal opinion that "it is unethical to require a lien or security device unless the member adheres to the provisions of rule 5-101 [now rule 3-300]." (1 Cal. Compendium on Prof. Responsibility, State Bar Formal Opn. No. 1981-62, at p. IIA-174.) The Los Angeles County Bar Association came to the same conclusion: "Whenever an attorney engages in a fee arrangement which involves the use of subject matter as a source of payment, the attorney must be extremely careful to protect his client's rights and avoid adverse interest. At a minimum, the fee arrangement must be governed by the standards set forth in Rule 5-101 [now rule 3-300]." (3 Cal. Compendium on Prof. Responsibility, L.A. County Bar Assn. Formal Opn. No. 416 (Oct. 25, 1983), p. 122; contra, 2 Cal. Compendium on Prof. Responsibility, Bar Assn. of S.F. Ethics Opn. No. 1997-1, p. IIB-139.)[3]

The Restatement Third of the Law Governing Lawyers is in accord. Under the Restatement, a lawyer "may contract *in writing* with the client for a lien on the proceeds of the representation to secure payment for the lawyer's services and disbursements in that matter." (Rest.3d Law Governing Lawyers (2000) § 43, subd. (2)(a), p. 306, italics added.) The requirement of a writing "ensures that the client has notice that the lawyer may detain part of any recovery and an opportunity to bargain for a different result [citation]. The requirement of a writing also permits third parties to verify the lien's existence and provisions." (*Id.*, § 43, com. e, p. 309.)

The Court of Appeal perceived that a conflict existed among other jurisdictions as to whether a charging lien must be in writing—citing Wisconsin and Florida as examples—but a closer examination reveals that no such conflict

---

[3] Without citing its Formal Opinion No. 416, a subsequent opinion of the Los Angeles County Bar Association suggested that rule 3-300 did not apply to a *contingency fee* coupled with a lien against the client's prospective recovery "in the same matter in which legal services are being provided." (3 Cal. Compendium on Prof. Responsibility, L.A. County Bar Assn. Formal Opn. No. 496 (Nov. 16, 1998) p. 238.) However, the opinion *did* require a written agreement if the attorney's lien secured *hourly* fees "incurred in an unrelated case." (*Id.* at p. 239.) We are presented here only with a lien to secure hourly fees and thus do not decide whether rule 3-300 applies to a contingency-fee arrangement coupled with a lien on the client's prospective recovery in the same proceeding. (Cf. Bus. & Prof. Code, § 6147.)

exists. The Court of Appeal correctly identified Wisconsin as a jurisdiction that requires an attorney's charging lien to be in writing. (*Weigel v. Grimmett* (1992) 496 N.W.2d 206, 209–210 [173 Wis.2d 263].) Wisconsin thus supports our holding. However, the court erred in classifying Florida as a jurisdiction with a contrary position. In Florida, as in most other jurisdictions, a charging lien arises by operation of law when an attorney is retained and a positive judgment or settlement is obtained. Hence, there is no requirement in Florida that the client agree—orally *or* in writing—to the lien. (*Litman v. Fine, Jacobson, Schwartz, et al.* (Fla.Dist.Ct.App. 1987) 517 So.2d 88, 91–92.) Fletcher thus has failed to identify any jurisdiction that has embraced the rule he proposes.

Finally, our holding that an attorney's charging lien to secure payment of hourly fees is adverse within the meaning of rule 3-300 does not compromise the public policy in favor of attorney liens. Rule 3-300 does not bar attorneys from obtaining liens on future recoveries. The rule merely requires the attorney who wishes to obtain such a lien to explain the transaction fully, to offer fair and reasonable terms, to provide a copy of the agreement, to give the client an opportunity to seek independent legal advice, and to secure the client's written consent. (*Hawk, supra,* 45 Cal.3d at p. 601.) This is not a great deal more than is now required for most fee agreements: attorneys are required, with limited exceptions, to put most fee agreements in writing and explain fully the terms of the agreement. (*Ibid.*; see Bus. & Prof. Code, §§ 6147, 6148.) As we stated in *Hawk* in similar circumstances, "[w]e do not think that this interpretation of the rule is unduly onerous." (*Hawk, supra,* 45 Cal.3d at p. 601.)

We therefore conclude that an attorney who secures payment of hourly fees by acquiring a charging lien against a client's future judgment or recovery has acquired an interest that is adverse to the client, and so must comply with the requirements of rule 3-300.[4] Fletcher failed to comply with

---

[4] Fletcher also contends that Business and Professions Code sections 6147 and 6148, which regulate contingency-fee and hourly-fee contracts between attorneys and their clients, impliedly preempt the field of attorney-client transactions, and that section 6148, subdivision (d)(4) in particular exempted his fee agreement with Master Washer, a corporation, from any requirement of a writing. As demonstrated above, however, an agreement to secure client payment with an interest in client property imposes risks and consequences beyond those inherent in a fee agreement. A finding that regulation of the former is preempted by regulation targeted at the latter would render rule 3-300 meaningless, even though the drafters of the rule expressly contemplated that these provisions would have complementary effects. (Discussion, 23 pt. 3 West's Ann. Codes, Court Rules, *supra,* Rules Prof. Conduct, foll. Rule 3-300, p. 366 ["Rule 3-300 is not intended to apply to the agreement by which the member is retained by the client, unless the agreement confers on the member an . . . interest adverse to the client"].) Indeed, as Fletcher concedes, "if the lien is adverse to the client, then the requirements of Rule 3-300 are required to be satisfied." Moreover, we recognized the concurrent operation of the predecessor to rule 3-300 and Business and Professions Code sections 6147 and 6148 in *Hawk,*

the rule. Accordingly, Fletcher's lien may not be enforced in this proceeding. Were we to hold otherwise, "we would, in effect, be both countenancing and contributing to a violation of a rule we formally approved in order 'to protect the public and to promote respect and confidence in the legal profession.' " (*Chambers v. Kay, supra,* 29 Cal.4th at p. 158.) Such a result would be untenable as well as inconsistent with the policy considerations that animated the adoption of rule 3-300.

D<span style="font-size:smaller">ISPOSITION</span>

The judgment of the Court of Appeal is reversed insofar as it reversed the trial court's order sustaining the general demurrers of defendants Joseph S. Fischbach and Carlyle E. Davis et al., and the cause is remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied August 11, 2004.

*supra,* 45 Cal.3d at page 601. Finally, a finding of preemption would divest clients of any meaningful protection even when an attorney secures an interest that allows the client's interest in the property to be summarily extinguished. Fletcher offers nothing to suggest the Legislature intended this result.