Filed 4/5/21  Belcher v. Bakkers CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN A. BELCHER,<br><br>    Petitioner and Appellant,<br><br>        v.<br><br>MICHAEL Y.C. BAKKERS,<br><br>    Objector and Respondent. | G058893<br><br>(Super. Ct. No. 30-2018-01018203)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Jacki C. Brown, Judge.  Affirmed.

Law Offices of John A. Belcher and John A. Belcher for Petitioner and Appellant.

No appearance by Objector and Respondent.

This appeal concerns John A. Belcher's petition for payment of attorney fees and reimbursement of costs from Paul Bakkers' estate (Estate). For three years, Belcher rendered legal services to Paul,[1] and others in the Bakkers family, in litigation involving assets held in a family trust (Trust). Belcher asserts the probate court erroneously determined he must file a creditor's claim against the Estate and improperly denied his petition for attorney fees. We affirm the court's order.

FACTS

Paul and his wife, Joan Bakkers, hired Belcher to litigate a lawsuit they filed against their son, Michael Bakkers. The retainer agreement, dated January 26, 2016, stated the parties agreed Belcher would represent Paul, Joan, and their daughter Gaby Bakkers "as Trustees of the Bakkers Living Trust," in an action against Michael, his company Southwest Credit Company, and his girlfriend Linh Nguyen.

In the lawsuit, Paul and Joan alleged Michael was liable for financial elder abuse and other claims based on their belief he gained access to their finances and stole from them. (*Bakkers v. Bakkers* (Jan. 24, 2019, G054865) [nonpub. opn.] (*Bakkers I*).) In addition, they alleged Michael wrongfully designated himself as a joint tenant on the grant deed of their primary residence, located on Juanita Way in Placentia (Juanita Property). Michael used the property as security for a $700,000 loan, placing a lien on the Juanita Property. (*Bakkers I, supra,* G054865.). Paul and Joan owned an investment property located on Whitman Drive in Placentia (Whitman Property), and they alleged Michael wrongfully forced Joan to withdraw $375,000 cash to purchase the property from another son, Andrew Bakkers, when the home was going into foreclosure. (*Bakkers I, supra,* G054865.) Michael and Nguyen recorded a $375,000 deed of trust against the Whitman Property. The Juanita Property and the Whitman Property were included on the Trust's schedule of assets.

[1] For the sake of clarity and to avoid confusion, we refer to members of the Bakkers family by their first names.

2

Relevant to this appeal, the retainer agreement contained the following fee provision: "The representation will be handled on a contingent fee basis with our fee being dependent upon recovery through settlement or trial . . . . Our fee will be equal to 40 [percent] of any 'net recovery' as hereafter defined. In addition to the percentages of cash as our fee, in the event of a success in removing liens or recovering title we will receive an additional fee. As an additional fee, we will receive $100,000 if [the Juanita Property] is deeded back to plaintiffs. In addition, we will receive $80,000 if the lien on [the Whitman Property] is released and title is restored to plaintiffs." The agreement also specified the client would be responsible for all costs and expenses associated with litigation. Additionally, the parties agreed Belcher "shall have a lien for fees and costs" and the lien would attach to "any and all real property of the client, including any recovery the client may obtain . . . in this matter."

Neither Paul nor Joan survived the final resolution of their case. Joan died prior to prevailing at trial, and Paul died while the appeal was pending. After some delay, the probate court appointed a special administrator to represent the Estate on appeal. This court affirmed the judgment cancelling Michael's joint tenancy claim to the Juanita Property, restoring title to the Trust, and cancelling the $700,000 lien. We also affirmed the court's ruling to restore the entire Whitman Property to the Trust, without any liens. (*Bakkers I, supra,* G054865.)

Because it is relevant to this appeal, we will briefly digress to discuss facts relating to the special administrator. After Paul passed away, we gave Belcher time to file a party substitution motion. We denied Belcher's first motion to substitute Gaby as respondent in place of Paul because counsel failed to comply with Code of Civil Procedure section 337.32. (*Bakkers v. Bakkers* (July 17, 2018, G054865) [nonpub. order].) Despite being given 60 days, Belcher failed to file a party substitution motion and this court held oral argument. (*Bakkers v. Bakkers* (Sept. 19, 2018, G054865) [nonpub. order].)

3

Before we filed the opinion in *Bakkers I,* counsel filed a request for judicial notice "of the probate court's order appointing Robert M. Newell, Jr., as special administrator 'limited to the pending appeal litigation for purposes of standing.'" (*Bakkers I, supra,* G054865.)  As noted in our prior opinion, the probate court cautioned, "'These Special Letters do not extend beyond the powers needed to represent the estate in the pending appeal[]'" and the letters expired at the conclusion of the appeal.  (*Ibid.*)  As part of our written opinion, we granted Belcher's motion to substitute Newall as a party for Paul.  (*Bakkers I,* G054865.)

In February 2019, approximately one month after we issued the *Bakkers I* opinion, Belcher filed a "petition for approval and order for payment of attorney[] fees and reimbursement of costs[]" (Fee Petition).  (Capitalization omitted.)  Noticeably absent from the Fee Petition was any legal authority authorizing the probate court to pay Belcher's attorney fees and costs.  He requested $180,000 in attorney fees "as provided for in the retainer agreement, for successfully removing the fraudulent liens on the [Juanita and Whitman] Properties," as well as $7,756.93 in costs and expenses incurred during the lawsuit.  Belcher noted the request was reasonable because he spent over 700 hours on the case and he typically charged $500 per hour.

Michael, as a self-represented litigant, filed an objection.  He argued his 90- year-old parents lacked the mental capacity to enter into the contingency fee agreement.

A few months later, Belcher filed a creditor's claim for $190,715.  The Judicial Council's form requested facts supporting the claim.  Belcher wrote that from January 2016 to January 2019, he was owed $180,000 in attorney fees pursuant to a contingency agreement.  He calculated that from July 2014 through June 2018, he was owed $10,715 for "[c]osts accrued including court fees, depositions, [and] shipping costs[.]"  He served a copy of the creditor's claim to Newell by mail.

4

At the hearing on the Fee Petition, Belcher submitted evidence showing he and his associate spent over 700 hours working on the case and the appeal. On the second day of the hearing, the probate court stopped the proceedings and, on its own motion, set an order to show cause (OSC) "against the petitioner for failing to comply with the mandatory statutory procedures for a creditor's claim in a probate proceeding." In its written order, the court noted Michael, a self-represented litigant, did not know how to file a demurrer to the improper Fee Petition. The court explained Belcher failed to address "the obvious anomaly that this request for attorney[] fees stemmed from a civil lawsuit fully litigated before Paul['s] . . . death, but not affirmed on appeal until after [his] passing," and therefore, it was a creditor's claim against Paul's estate. It asked the parties to file briefing on this issue.

In his briefing, Belcher asserted he did not have to file a creditor's claim for two reasons. He maintained there were currently competing petitions for appointment of a personal representative and a creditor cannot file a claim until *after* receiving the personal representative's notice of administration of the estate. (Prob. Code, § 9100, subd. (a) [deadlines for creditor's claims].)[2] He reasoned that because the court had not yet resolved the issue of who would serve as the Estate's personal representative, no official notice had been sent to creditors, and the section 9100 timelines were not triggered. Second, Belcher concluded the time was "[r]ipe" for the court to adjudicate his Fee Petition because the court had already "heard and granted" petitions filed by two other attorneys. He submitted copies of the probate court's prior orders approving and paying attorney fees and costs incurred by Paul's temporary conservative, Cheryl Walsh, and the guardian ad litem, Ernest Hayward. Belcher asserted his fees, incurred to preserve the Estate's "only assets," were a proper expense of administration and must be given a higher priority of distribution than any other creditor claims.

[2] All further statutory references are to the Probate Code, unless otherwise indicated.

5

The probate court held the OSC hearing in early January 2020. It issued a lengthy statement of decision denying Belcher's Fee Petition. After summarizing the underlying facts, the court stated it appreciated Belcher believed his fees and costs represented expenses incurred by the Estate because his legal efforts returned assets to the Trust. However, it was not pleased with Belcher's efforts at the OSC hearing to change his request from $180,000 to over $400,000. In the statement of decision, the court commented Belcher submitted 15 pages of time sheets and "[a]lthough not requested in his petition, [Belcher] . . . argued that a *reasonable* fee should be the total of his hourly services *multiplied* by 33 [percent] for a total amount of $434,600, instead of the $180,000 plus costs requested in his petition's prayer." The court also pointed out Belcher covered his bases by filing both the Fee Petition and creditor's claim (served on Newell, the person appointed as a special administrator during the appeal). The court noted the Estate did not currently have a special administrator but there were currently "competing petitions for appointment as special administrator . . . filed by [Gaby] and [Michael] . . . [and] set for [a] joint trial on January 13, 2020 . . . ."

Considering the facts and arguments presented, the probate court made the following ruling: "The [c]ourt does *not* make any findings or rulings as to whether [Belcher] has a valid creditor's claim or if it is time-barred; that is not before the [c]ourt. The [c]ourt, however, finds that any remedial action by [Belcher] is limited to the contractual terms laid out in the retainer agreement (Exh[ibit No.] 201), and that agreement was *not* for legal services to the probate [E]state. It is a contractual obligation between Belcher and [Paul] as an individual—or [Joan and Gaby] as trustees of the [Trust]. [Belcher] cannot now *change* the terms of his fee agreement, nor can he argue to *this* [c]ourt that he is entitled to greater fees than the 40 [percent] recovery augmented by the $180,000[] as detailed in the retainer agreement. However, the petition itself 'prays'

6

for an order for payment of attorney[] fees in the amount of $180,000[] plus reimbursement of costs in the amount of $7,756.93 *and nothing more*. At trial, he argued for substantially more, using a multiplier of 33 [percent]. [¶] The [c]ourt now orders entry of judgment against the petitioner as the attorney fee request is for legal services rendered to the decedent(s) before [they died], although the final opinion in the appeal still had to be received. Thus, the fees are owed to Belcher from [the Estate] in the form of a creditor's claim."

The last section of the statement of decision discussed the reasons why Belcher's legal authority was inapplicable. The court also rejected Belcher's assertion the court should invoke its equitable powers on his behalf because to deny him fees would be unjust and unfair. The court responded, "But this [c]ourt is not entertaining anything about a creditor's claim for this amount; that appears to still be pending, having been filed in June 2019[,] but awaiting appointment under competing petitions of the special administrator. [¶] The [c]ourt grants its own motion entering judgment against [Belcher]."

DISCUSSION

Simply stated, the sole legal issue we must decide in this case is what procedures apply for an attorney seeking payment of fees and costs from a deceased client. As will be explained in more detail below, Belcher's contingency fee agreement with Paul created an attorney charging lien, which has not yet been adjudicated to establish its existence or the amount secured. While we are sympathetic to Belcher's predicament of having to wait further to be paid for his legal services in this lengthy dispute, his only option is to file a creditor's claim because establishing a viable lien requires resolution of the decedent's personal liability. As noted by the probate court, its denial of the Fee Petition had no effect on Belcher's ability to pursue his creditor's claim. We affirm the ruling.

7

I. *Applicable Legal Principles*

A. *Section 2631 Petitions*

We begin with legal authority relating to Belcher's assertion his petition was the proper mechanism for seeking attorney fees because the court authorized payment to two other attorneys. The record shows that in 2018 (soon after Paul died), the court considered petitions seeking "approval and order" for payments of attorney fees incurred by Paul's conservator and guardian ad litem. Belcher fails to appreciate court-approved attorney fees and expenses incurred by conservators and guardians are specifically authorized by statute. (§ 2631, subd. (a).)[3] Belcher fails to cite to any statutory authority, and we found none, permitting the court to authorize or order the payment of fees incurred by legal counsel hired by the decedent *before* his death. Section 2631 does not assist Belcher in this appeal.

B. *Claims of Creditors*

"'"A probate or trust estate is not a legal entity; it is simply a collection of assets and liabilities. As such, it has no capacity to sue or be sued, or to defend an action. Any litigation must be maintained by, or against, the executor [or personal representative] of the estate."'" [Citation.]" (*Smith v. Cimmet* (2011) 199 Cal.App.4th 1381, 1390-1391, fn. omitted.)

"Generally, anyone who demands payment from an estate, based on a debt or the liability of the decedent, must file a claim against the estate in accordance with the requirements of the Probate Code. Even though the statute of limitations may have a

---

[3] Section 2631 provides the following: "(a) Upon the death of the ward or conservatee, the guardian or conservator may contract for and pay a reasonable sum for the expenses of the last illness and the disposition of the remains of the deceased ward or conservatee, and for unpaid court-approved attorney's fees, and may pay the unpaid expenses of the guardianship or conservatorship accruing before or after the death of the ward or conservatee, in full or in part, to the extent reasonable, from any personal property of the deceased ward or conservatee which is under the control of the guardian or conservator."

long time to run on an action, probate statutes generally require the filing of claims within a shorter time period. The purpose of the requirement is to give the representative an opportunity to ascertain speedily the obligations against the estate and the method of payment. [Citation.] All claims must be filed in the manner and within the time provided under . . . sections 9000 et seq., and any claim that is not so filed is barred. [Citation.] However, the creditor's duty to file a claim is not triggered unless the personal representative gives proper notice of administration. [Citation.]" (Gold, et al., Cal. Civil Practice: Probate & Trust Proceedings (2020) ¶ 13:1.)

Section 9000 provides as follows: "As used in this division: (a) 'Claim' means a demand for payment for any of the following, whether due, not due, accrued or not accrued, or contingent, and whether liquidated or unliquidated: [¶] (1) Liability of the decedent, whether arising in contract, tort, or otherwise." And a "'Creditor' means a person who may have a claim against estate property." (§ 9000, subd. (c).) The representative need not pay if the claim is not properly filed, and failure in this regard is an absolute bar to enforcement. (§ 9002.) Thus, a plaintiff who wishes to recover money for a breach of contract claim against a deceased defendant must file a section 9000 claim, after the personal representative of the estate gives notice of administration. (§ 9050.) Only if the representative denies the claim may the plaintiff file a lawsuit against the decedent's personal representative. (§ 9351.)

There are limited exceptions to the claim requirement. Relevant to this case, a "lien creditor may, without filing a claim in probate, bring an equitable action to foreclose the judgment lien, but he has no right to a deficiency. [Citation.]" (*County Line Holdings, LLC v. McClanahan* (2018) 22 Cal.App.5th 1067, 1072-1073 (*County Line Holdings*); § 9391.) "The creditor may bring the action at any time during the statutory duration of the judgment lien. [Citation.]" (*Ibid.*, fn. omitted.)

With regards to this lien exception, section 9391 provides the following: "[T]he holder of a mortgage or other lien on property in the decedent's estate, including,

9

but not limited to, a judgment lien, may commence an action to enforce the lien against the property that is subject to the lien, without first filing a claim as provided in this part, if in the complaint the holder of the lien expressly waives all recourse against other property in the estate.  Section 366.2 of the Code of Civil Procedure [one year statute of limitations] does not apply to an action under this section.  The personal representative shall have the authority to seek to enjoin any action of the lienholder to enforce a lien against property that is subject to the lien." (§ 9391.)

In *County Line Holdings*, the court considered whether a judgment lienholder was barred by the one year statute limiting creditor's claims against the decedent.  (*County Line Holdings, supra,* 22 Cal.App.5th at p. 1069.)  That court determined Code of Civil Procedure section 366.2 limited the time to bring a cause of action, not the time to enforce a judgment following a judgment debtor's death.  (*Ibid.*)  Following our Supreme Court's decision in *Corporation of America v. Marks* (1937) 10 Cal.2d 218, the court explained the rule as follows:  "[W]hile the debtor is still alive, the usual and ordinary method of enforcement of a judgment lien is by execution sale. [Citation].  On death of the debtor, however, . . . former section 732, now section 9300, terminates the right of the creditor to enforce the judgment lien by execution and sale. [Citation.]  'But the death of the debtor does not terminate the judgment lien.'  [Citation.] The lien continues for its statutory duration unless sooner terminated by satisfaction or discharge.  [Citation]  'The judgment lien creditor . . . may file a claim, and in such event the priority of his lien will be protected in the administration proceeding . . . , and he will have a claim for any deficiency against the general estate of the decedent.'  [Citation.]" (*County Line Holdings, supra,* 22 Cal.App.5th at p. 1072.)

"Our Supreme Court expressly rejected the . . . contention that enforcement of the judgment lien in the course of estate administration is the exclusive remedy of the judgment lien creditor on the death of the debtor prior to levy of execution.  [Citation.] The court stated heirs and distributees take subject to the lien.  [Citation.]  "'A judgment

10

lien has always been regarded as the highest form of security.'" [Citation.] A judgment lien creditor may, without filing a claim in probate, bring an equitable action to foreclose the judgment lien, but he has no right to a deficiency. [Citation.] The creditor may bring the action at any time during the statutory duration of the judgment lien. [Citation.] [¶] Thus, under *Corporation of America*, the judgment creditor has an option: file a timely claim in the estate probate proceeding and seek a deficiency; or, without filing a claim, bring an action to foreclose the lien during its statutory duration, waiving any right to a deficiency. In neither case does the lien lose its priority." (*County Line Holdings, supra,* 22 Cal.App.5th at pp. 1072-1073, fn. omitted.)

It is telling that Belcher did not include this well settled legal authority in his appellate briefing. The two procedural avenues available to holders of secured liens do not include the path Belcher took in this case, i.e., filing a Fee Petition against the Estate to enforce the lien.

C. *Attorney Charging Lien*

Belcher asserts for the first time on appeal that his contingency fee agreement with Paul created an attorney charging lien, which did not fully ripen until after the matter was appealed. Noticeably missing from his discussion was legal authority describing how attorneys must establish the value and validity of the lien before seeking enforcement. For this reason, we recite a brief primer on both the creation and collection of attorney charging liens.

"'A lien is a charge imposed in some mode other than by a transfer in trust upon specific property by which it is made security for the performance of an act.' [Citation.] An attorney's lien 'upon the fund or judgment which he has recovered for his compensation as attorney in recovering the fund or judgment . . . is denominated a "charging lien."' [Citation.] A charging lien may be used to secure either an hourly fee or a contingency fee. [Citation.]" (*Fletcher v. Davis* (2004) 33 Cal.4th 61, 66 (*Fletcher*).)

11

Unlike most jurisdictions, in California a charging lien "'is created only by contract . . . . Unlike a service lien or a mechanic's lien, for example [citations], an attorney's lien is not created by the mere fact that an attorney has performed services in a case.' [Citations.]" (*Fletcher, supra,* 33 Cal.4th at p. 66.) A charging lien gives the attorney "'an equitable assignment *pro tanto* of the client's claim'" (the proceeds of the client's recovery, if any) as security and entitles the attorney to "'any available equitable remedy necessary to effect payment'" of the fees and costs owed. (*Epstein v. Abrams* (1997) 57 Cal.App.4th 1159, 1169.) For liens created in a contingency fee contract, a cause of action to enforce the lien "'does not accrue until the occurrence of the stated contingency.' [Citation.]" (*Southern California Gas Co. v. Flannery* (2016) 5 Cal.App.5th 476, 494 (*Flannery*).)

"An attorney's contractual lien is created and takes effect when the fee agreement is executed. [Citations.] . . . [¶] Where there are competing liens, the general rule is that, all things being equal, liens have priority according to the time of their creation. [Citation.] An attorney's lien on a judgment for services prevails over later encumbrances. [Citations.] [¶] Public policy favors the priority of the attorney lien. 'If an attorney's claim for a lien on the judgment based on a contract for fees earned prior to and in the action cannot prevail over the lien of a subsequent judgment creditor, persons with meritorious claims might well be deprived of legal representation because of their inability to pay legal fees or to assure that such fees will be paid out of the sum recovered in the latest lawsuit. Such a result would be detrimental not only to prospective litigants, but to their creditors as well.' [Citation.]" (*Waltrip v. Kimberlin* (2008) 164 Cal.App.4th 517, 525 (*Waltrip*).)

"Equitable considerations also favor the attorney lien. It is a principle of equity that 'those whose labor, skills and materials resulted in the creation of a fund should be entitled to priority in the payment of their claims from such source.' [Citation.] . . . It is the attorney's labor, skill and materials, and his willingness to take the risk of no

12

recovery, that results in the judgment or settlement paid to the debtor.  [Citation.]  '"The special or charging lien of an attorney has been held to be an equitable right to have the fees and costs due to him for services in a suit secured to him out of the judgment or recovery in the particular action, the attorney to the extent of such services being regarded as an equitable assignee of the judgment.  It is based, as in the case of a lien proper, on the natural equity that a party should not be allowed to appropriate the whole of a judgment in his favor without paying for the services of his attorney in obtaining such judgment."'  [Citation.]"  (*Waltrip, supra*, 164 Cal.App.4th at pp. 525-526.)

As mentioned, the attorney charging lien is created when the fee agreement is signed.  "Unlike a judgment creditor's lien, which is created when the notice of lien is filed [citation], an attorney's lien is a "secret" lien; it is created and the attorney's security interest is protected even without a notice of lien.  [Citations.]'  [Citation.]  Still, it is 'permissible, and even advisable,' for an attorney to file a notice of lien in the underlying action, meaning the action where the attorney is the client's attorney of record or—in the case of an attorney who has been discharged—where the attorney previously represented the client.  [Citation.]'"  (*Flannery, supra,* 5 Cal.App.5th at p. 494.)

"It is well recognized that, regardless of whether an attorney files a notice of lien, the court deciding the underlying action lacks jurisdiction to decide the existence or validity of the attorney's lien claim on the underlying judgment.  [Citations.] . . . Because the attorney cannot intervene in the underlying action, '[a]fter the client obtains a judgment, the attorney must bring a *separate, independent action* against the client to establish the existence of the lien, to determine the amount of the lien, and to enforce it.'  [Citation.]"  (*Flannery, supra,* 5 Cal.App.5th at p. 495.)  The court in *Brown v. Superior Court* (2004) 116 Cal.App.4th 320, 333, clarified an attorney need not sue his former client for breach of contract, but rather the attorney need only bring a separate action against his client, such as one for declaratory relief.

13

II. *Analysis*

Belcher asserts his Fee Petition was the proper mechanism to require the probate court to immediately pay legal costs arising from contractually-established legal services benefitting the Estate. He asserts the court erred by concluding he must file a creditor's claim with the Estate's personal representative because this option fails to consider his status as a lienholder. Belcher misunderstands the nature of charging liens and the limited exceptions to the creditor claim requirements for probated estates.

As explained in *Mojtahedi v. Vargas* (2014) 228 Cal.App.4th 974, 976 (*Mojtahedi*), an attorney charging lien is only effective if the attorney has filed an independent action to establish the lien's amount and enforceability. In that case, an attorney who had previously represented two clients filed a complaint against the clients' successor attorney, seeking to recover a portion of a settlement payment the successor attorney had obtained for the clients. (*Ibid.*) The trial court sustained without leave to amend the defendant's demurrer to the complaint because the attorney had failed to establish the amount or enforceability of his lien in an independent action against the clients. (*Id.* at pp. 976-977.) The appellate court agreed and reiterated the "well established" rule that "'"[a]fter the client obtains a judgment, the attorney must bring a separate, independent action against the client to establish the existence of [an attorney's] lien, to determine the amount of the lien, and to enforce it."'" [Citations.]" (*Id.* at pp. 977-978, quoting *Brown, supra*, 116 Cal.App.4th at p. 328.) Although the plaintiff (attorney) in *Mojtahedi* alleged he had a contract with his former clients and provided records showing his time and costs, the court determined the attorney had "failed to allege facts establishing that he adjudicated the existence, value, or enforceability of his lien. . . . A log of plaintiff's time, although useful to adjudicate the reasonable value of plaintiff's services in a separate action against the clients, is insufficient to establish that plaintiff is entitled to a particular amount of settlement money in his suit against defendant. Plaintiff admits that he never brought a separate action against his clients to

14

litigate those issues.  Therefore, he has yet to establish the value or validity of his purported lien." (*Mojtahedi, supra,* 228 Cal.App.4th at p. 978.)

The *Mojtahedi* court rejected the attorney's argument that he did not have to file a separate action because he and his client did not dispute the amount of the lien. (*Mojtahedi, supra,* 228 Cal.App.4th at p. 978.)  It held the lack of a dispute was "insignificant" because this fact failed to "alter the applicability of the central principle . . . the attorney's lien *is only enforceable after the attorney adjudicates the value and validity of the lien in a separate action against his client*." (*Ibid.,* italics added.)  It added the following:  "Plaintiff provided the services to the clients, not to defendant.  If successful in a declaratory relief action regarding the reasonable value of his services, plaintiff's fees will be paid out of the clients' settlement proceeds.  [Citation.]  Plaintiff must thus litigate with the clients to determine the reasonable cost of the services he provided to them.  Plaintiff has omitted this essential step of establishing his entitlement to a particular portion of the settlement proceeds." (*Ibid.*)

Following the legal analysis set forth in the *Brown* case, the court in *Mojtahedi* stated that requiring an attorney to institute an action did not mean he or she must sue the client for breach of contract. (*Mojtahedi, supra,* 228 Cal.App.4th at p. 979.) "[B]y seeking a declaration regarding the reasonable value of his services rendered, plaintiff will address the issue without subjecting his former clients to damages. Importantly, this procedure also gives the court an opportunity to evaluate the value and quantity of plaintiff's services with the relevant parties:  plaintiff and his former clients." (*Ibid.*)  The court concluded, "Despite case law requiring plaintiff to bring a separate declaratory relief action against the clients, plaintiff has not sought such relief[,] and therefore, "failed to establish the existence, amount, and enforceability of his lien on the settlement money." (*Ibid.*)

In the case before us, Belcher was unable to file a separate, independent action to establish the amount and enforceability of the lien before Paul died. Belcher would like us to assume that if Paul had not died, Paul had no choice but to pay the contractually agreed upon $180,000 lien plus costs. Not so. In a declaratory relief action, Paul could have raised grounds to challenge the validity of the lien or the reasonableness of the costs (which Belcher vacillates as ranging from $7,700 to over $10,000). Attorney liens are not automatically enforceable. (See, *Plummer v. Day/Eisenberg* (2010) 184 Cal.App.4th 38 [triable issue of fact whether attorney had valid enforceable lien on settlement proceeds].)

After Paul died, the issue of the lien's amount and enforceability still needed to be adjudicated. Because a declaratory relief claim would involve the personal liability of the decedent, Belcher must comply with creditor claim statutes if he wishes to enforce the contractually created lien.[4] We cannot imagine any circumstances in which the probate court could order payment on a $190,715 charging lien, created before the decedent's death, without first giving Paul's personal representative an opportunity to review or challenge the amount requested or the lien's enforceability.

In summary, just as if Paul were still alive, Belcher must adjudicate the lien's validity before seeking enforcement. (*Mojtahedi, supra,* 228 Cal.App.4th at p. 978.) We conclude none of the cases cited by Belcher say otherwise. For example, in *Novak v. Fay* (2015) 236 Cal.App.4th 329, 331-332, the court held an attorney lien on a deceased beneficiary's share of trust may not be subject to the creditor's claim

---

[4] In its ruling, the court repeatedly stated it made no factual findings or rulings regarding the validity or timing of Belcher's creditor's claim. For this reason, we need not discuss Belcher's arguments concerning what should be the deadline for filing a creditor's claim in this case. (Citing *Clark v. Kerby* (1992) 4 Cal.App.4th 1505, 1514 [application of statute of limitations on creditor's claims]. There is no need for an advisory opinion.

16

requirement in that deceased beneficiary's estate. In our case, the attorney's unverified lien purportedly attaches to property held in the deceased's estate, not a beneficiary's estate.

Belcher's reliance on *Dacey v. Taraday* (2011) 196 Cal.App.4th 962 (*Dacey*), is also misplaced. That court held Code of Civil Procedure section 366.2's one-year statute of limitations will bar any action on a debt of the decedent or for any wrongdoing committed by the decedent, but it will not apply when the wrongdoing was committed by the estate's administrator. (*Id.* at p. 986.) In *Dacey*, several partners of a law firm entered into a dissolution agreement, and in winding up their practice, they assigned certain cases to one partner, Burton J. Goldstein. (*Id.* at p. 966.) The parties agreed each former partner would receive specified percentages from the attorney fees Goldstein recovered in those cases. (*Ibid.*) However, Goldstein died before completing the cases. The administrator of Goldstein's estate settled the cases and agreed to reduce the estate's share in the fee recovery. (*Ibid.*) When one of Goldstein's former law partners learned he would not be receiving his designated percentage of recovered attorney fees, he did not file a creditor's claim but rather sued the administrator for breaching the dissolution agreement. (*Ibid*.) The appellate court affirmed the judgment in his favor, ruling the statute of limitations did not bar his claims against the estate because it was the administrator, not the decedent, who breached the dissolution agreement. (*Id.* at pp. 986-987.)

The *Dacey* court held "section 366.2 does not apply in the present case where the debt was not enforceable against Goldstein while he was alive and the breach of the contract occurred after Goldstein's death." (*Dacey, supra,* 196 Cal.App.4th at p. 986, fn. omitted.) In addition, the court determined the "estate failed to preserve for appeal the issue that [the plaintiff's] failure to comply with the Probate Code and file a timely creditor's claim bars his breach of contract claim." (*Id.* at p. 979.) It provided the following explanation: "[A] claim based on failure to file within the claims filing period

of the Probate Code was mentioned in conjunction with the statute of limitations under section 366.2, but was not presented as an independent defense. Accordingly, we conclude that this issue was not sufficiently preserved for appeal as an *independent basis* for rejecting [plaintiff's] breach of contract claim." (*Id.* at p. 978.) Nothing in this case supports Belcher's contention he was not required to file a creditor's claim to recover on an unestablished lien.

In the last section of his appellate brief, Belcher asserts his fee claim should be treated as an expense of the Estate's administration because the lawsuit protected the Estate's only assets. This argument is not premised on the theory he is a lienholder. Rather, it is based entirely on inapplicable case law discussing appropriate expenses incurred and paid during probate proceedings. (See, *Estate of Stauffer* (1959) 53 Cal.2d 124, 130 [permitting attorney fees from estate for extraordinary services given to personal representative]; *Estate of Kann* (1967) 253 Cal.App.2d 212, 214-215 [upholding common fund award to objectors' attorney for successfully challenging executrix' administration and benefitting others]; *Eastwood v. Stewart* (1923) 64 Cal.App. 614, 615 [executrix hired real estate agent who sued for earned commissions].)[5]

---

[5] Belcher also cited multiple cases concerning application of the "common fund rule" in probate cases. The common fund doctrine provides "an exception to the general American rule that parties bear the costs of their own attorneys" and permits courts to exercise its equitable power to award attorney fees to a party who has recovered or preserved a monetary fund for the benefit of himself and others. (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488-489.) "Because it distributes the cost of hiring an attorney among all the parties benefited, a common fund fee award has sometimes been referred to as 'fee spreading.'" (*Ibid.*) The doctrine does not apply when the litigation does not result in the creation or preservation of a fund. (*Northwest Energetic Services, LLC v. California Franchise Tax Bd.* (2008) 159 Cal.App.4th 841, 878.) Belcher is not a prevailing party in the case against Michael, and the underlying litigation certainly did not create a fund to benefit himself. To be clear, he was the *attorney* of parties who prevailed in litigation filed on behalf of themselves. There was no need for equitable fee spreading among those plaintiffs. The doctrine is not applicable.

18

The record in the case before us plainly supports the probate court's determination the Estate did not hire Belcher to assist with any probate administrative matters.  It was undisputed Paul (individually) hired Belcher to help him sue Michael, Southwest Credit Company, and Nguyen for fraudulent conduct.  We find no support for Belcher's theory Paul's death transformed the completed civil litigation into a probate administration task.

DISPOSITION

The order is affirmed.  There being no appearance by Respondent, no costs are awarded.


O'LEARY, P. J.

WE CONCUR:


THOMPSON, J.


GOETHALS, J.

19